# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

ORISKA INSURANCE COMPANY,

Plaintiff,

v.

AVALON GARDENS REHABILITATION &
HEALTH CARE CENTER, LLC d/b/a BROOKSIDE
MULTICARE NURSING CENTER AND OPTIMA
CARE SMITHTOWN, LLC;

BAY PARK CENTER NURSING & REHABILITATION, LLC;

BAYVIEW MANOR LLC d/b/a SOUTH POINT PLAZA NURSING
AND REHABILITATION CENTER;

BROOKHAVEN REHABILITATION & HEALTH CARE CENTER,
 LLC;

EASTCHESTER REHABILITATION & HEALTH CARE;
CENTER, LLC;

GARDEN CARE CENTER, INC;

GOLDEN GATE REHABILITATION & HEALTH CARE
CENTER, LLC;

LITTLE NECK CARE CENTER, LLC
LITTLE NECK NURSING HOME LLC;

NASSAU OPERATING COMPANY, LLC d/b/a NASSAU
EXTENDED CARE FACILITY AND NASSAU
REHABILITATION AND NURSING CENTER/KINGSBRIDGE
HEIGHTS RECEIVER, LLC

NEW SURFSIDE NURSING HOME, LLC;

NORTH SEA ASSOCIATES, LLC d/b/a THE HAMPTONS
CENTER FOR REHABILITATION AND NURSING;

PARK AVENUE OPERATING COMPANY, LLC d/b/a PARK
AVENUE EXTENDED CARE FACILITY;

COMPLAINT

JURY TRIAL DEMANDED

6:18-CV-1030 [GTS/ATB]

PINEGROVE MANOR II, LLC d/b/a GRACE PLAZA
NURSING AND REHABILITATION CENTER;

THROGS NECK OPERATING COMPANY, LLC d/b/a
THROGS NECK EXTENDED CARE FACILITY;

TOWNHOUSE OPERATING COMPANY, LLC d/b/a
TOWNHOUSE CENTER FOR REHABILITATION & NURSING;

WILLOUGHBY REHABILITATION & HEALTH CARE CENTER
LLC d/b/a SPRING CREEK REHABILITATION & NURSING
CARE CENTER;

WOODMERE REHABILITATION & HEALTH CARE CENTER,
INC. d/b/a FIVE TOWNS PREMIER REHABILITATION AND NURSING;

NISKAYUNA OPERATING CO LLC d/b/a PATHWAYS NURSING
& REHABILITATION CENTER;

PARKVIEW CARE AND REHABILITATION CENTER, INC;

BENT PHILIPSON; AS THE PRINCIPAL PARTNER IN CONTROL
OF SENTOSACARE, LLC A/K/A SENTOSA GROUP.

SENTOSACARE, LLC;

SAMUEL SCHLESINGER; INDIVIDUALLY AND AS PRINCIPAL
PARTNER AND AS OFFICER, DIRECTOR AND OWNER OF
ALLSTATE ASO, INC. and ALLSTATE ADMINISTRATORS, LLC;

ALLSTATE ADMINISTRATORS, LLC
a/k/a ALLSTATE ASO, LLC;

ISAAC MULLER; INDIVIDUALLY AND AS AN AGENT FOR
THE DEFENDANTS HEREIN NAMED;

RASHBI MANAGEMENT, INC.;

US MANAGEMENT, INC.

Defendants,

# TABLE OF CONTENTS

I.   NATURE OF THIS ACTION ................................................................ 3
II.  JURISDICTION AND VENUE ........................................................... 6
III. PARTIES ............................................................................................ 7
IV.  FACTS COMMON TO ALL CAUSES OF ACTION............................. 12
V.   RECENT DEFALCATIONS NOW COUPLED WITH LAUNDERING................ 16
VI.  FACTS FROM PRIOR NORTHERN DISTRICT OF NEW YORK CASE NO. 03-CV-01481 AND SUBSEQUENT EVENTS ................................................... 21
VII. CHRONOLOGY OF EPISODES.......................................................... 31
VIII.    AS AND FOR THE FIRST CAUSE OF ACTION ALLEGING VIOLATIONS UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ................................................................................................. 40
A.   Violation of RICO Section 1962 (c)...................................................... 40

   1.   Introduction .................................................................... 40

   2.   Conducting and Participating in the Affairs of the Enterprise Through a Pattern of Racketeering Activity ............................................................. 40

   3.   The Enterprise ................................................................. 40

   4.   The Pattern of Racketeering Activity.......................................... 41

   i.   Wire Fraud (18 U.S.C. §1343) ............................................... 41
   ii.  Embezzlement from an Employee Benefit Plan (18 U.S.C. § 664) ........................... 51
   iii. Money Laundering (18 U.S.C. § 1956)......................................... 51

   5.   Injury to Business........................................................... 53

IX.  AS AND FOR THE SECOND CAUSE OF ACTION ALLEGING VIOLATION UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ................................................................................................. 53
A.   Violation of RICO Section 1962 (a)...................................................... 53

   1.   Investing Income from Racketeering Activity in the Enterprise .................. 54

   2.   Injury to Business........................................................... 54

X. AS AND FOR THE THIRD CAUSE OF ACTION ALLEGING VIOLATION UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ...................................................................................................................... 55
A.      Violation of RICO Section 1962 (d) ..................................................... 55

        1. Conspiracy to Invest the Proceeds of Racketeering Activity in the Enterprise and

to Conduct and Participate in the Affairs of the Enterprise Through a Pattern of

Racketeering Activity ........................................................................................... 55

        2. Injury to Business ................................................................................. 56

XI. AS AND FOR A FOURTH CAUSE OF ACTION UNDER THE LANHAM ACT 57
XII. AS AND FOR A FIFTH CAUSE OF ACTION ALLEGING ERISA VIOLATIONS . ...................................................................................................................... 59
XIII.    AS AND FOR THE SIXTH CAUSE OF ACTION ALLEGING CONVERSION ...................................................................................................................... 68
XIV.     AS AND FOR THE SEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT ........................................................................................ 68
XV.      AS AND FOR THE EIGHTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY ...................................................................................... 68
XVI.     AS AND FOR THE NINTH CAUSE OF ACTION THE AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ...................................... 69
XVII.    AS AND FOR THE TENTH CAUSE OF ACTION FOR A CONSTRUCTIVE TRUST ..................................................................................................... 70
XVIII. AS AND FOR THE ELEVENTH CAUSE OF ACTION FOR AN ACCOUNTING .......................................................................................... 71
XIX.     PLAINTIFF IS ENTITLED TO THE BENEFIT OF ERISA'S AND RICO'S FRAUD OR CONCEALMENT LIMITATIONS PERIOD ............................ 71
XX.      RELIEF ..................................................................................................... 72

Plaintiff, Oriska Insurance Company, by and through its attorney of record herein, for its complaint against the named Defendants, arising from misrepresentation, deceit and defalcation committed by the Defendants, and for damages, penalties, and other remedies available on behalf of the Plaintiff, show unto the Court the following:

## I.      NATURE OF THIS ACTION

1.      This action is brought by Plaintiff to redress violations of the Lanham Act Section 43(a), 15 U.S.C. § 1125(a), the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et seq. ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), as well brought by seeking redress under and under N.Y. Gen. Bus. Law §§ 349 and 350 and various state common law causes of action. Plaintiff seeks monetary and equitable relief, penalties, attorney fees, costs, and disbursements incurred as a result of Defendants' violations, for breach of fiduciary duties and for claims for deceptive business practices. Plaintiff seeks to recover damages and penalties arising from Defendants' fraud in connection with Defendants' improper, fraudulent, and unlawful diversion, embezzlement and defalcation of payments by Defendants Avalon Gardens Rehabilitation & Health Care Center, LLC d/b/a Brookside Multicare Nursing Center and Optima Care Smithtown, LLC; Bay Park Center Nursing & Rehabilitation, LLC; Bayview Manor LLC d/b/a South Point Plaza Nursing and Rehabilitation Center; Brookhaven Rehabilitation & Health Care Center, LLC; Eastchester Rehabilitation & Health Care Center, LLC; Garden Care Center, Inc; Golden Gate Rehabilitation & Health Care Center, LLC; Little Neck Care Center, LLC; Little Neck Nursing Home LLC; Nassau Operating Company, LLC d/b/a Nassau Extended Care

3

Facility and Nassau Rehabilitation and Nursing Center/Kingsbridge Heights Receiver, LLC; New Surfside Nursing Home, LLC; North Sea Associates, LLC d/b/a The Hamptons Center For Rehabilitation and Nursing; Park Avenue Operating Company, LLC d/b/a Park Avenue Extended Care Facility; Pinegrove Manor II, LLC d/b/a Grace Plaza Nursing and Rehabilitation Center; Throgs Neck Operating Company, LLC d/b/a Throgs Neck Extended Care Facility; Townhouse Operating Company, LLC d/b/a  Townhouse Center For Rehabilitation & Nursing; Willoughby Rehabilitation & Health Care Center, LLC d/b/a Spring Creek Rehabilitation & Nursing Care Center; Sentosacare, LLC; Woodmere Rehabilitation & Health Care Center, Inc. d/b/a Five Towns Premier Rehabilitation and Nursing; Niskayuna Operating Co LLC d/b/a Pathways Nursing & Rehabilitation Center; Parkview Care and Rehabilitation Center, Inc.; Allstate Administrators, LLC a/k/a Allstate ASO, LLC (hereinafter defined as "Sentosa SNFs") for reimbursement of workers compensation benefits paid to employees of Sentosa SNFs by Plaintiff.

2.     The overall scheme is the diversion to personal use of Defendants and insiders of funds expensed by Sentosa SNFs identified as Workmen's Compensation Insurance reported to the New York State Department of Health ("DOH") at data item Part IV, Schedule 6, Column 0157, line 026, as certified in the Sentosa SNFs' Cost Reports (Form RHCF-4, "Workmen's Compensation Insurance" is the table designation used in each of the Cost Reports [1] attached hereto as Exhibit 1, where "Op Cert" stands for Operating Certificate and "DCN" is the Declaration Cost Control Number). The players

---

[1] The term "Workmen's Compensation Insurance" from the Cost Reports and the term "workers' compensation insurance" used generally are used interchangeably throughout this complaint.

4

who facilitate the diversion and the means and methods of the fraud have varied, but the core scheme is the same from June 2002 to May 2018.

3.     The scheme is to divert reported Workmen's Compensation Insurance funds to a straw person. The straw person holding itself out as the commercial workers' compensation carrier was Allstate from 2010-2018, and US Management from 2002-2008. The transactions pass audit because the payment from the Sentosa SNFs for Workmen's Compensation Insurance corresponds with the bogus invoices from the straw person named Allstate. The scheme used Plaintiff's credentials, authority, licensing and property to deceive government authorities, consumers and the public while converting, diverting, embezzling and then laundering the fruits of the scheme to and for the benefit of the Defendants and insiders.

4.     The straw person hid millions of dollars of reported Workmen's Compensation Insurance. Defendants reimbursed to the Plaintiff only a portion of the workers' compensation benefits paid to employees of Sentosa SNFs. The Defendants reimbursed just enough to keep the scheme afloat and the Plaintiff carrier lulled into believing that the workers' compensation benefit funds are being held in trust by an independent fiduciary that can be called upon to reimburse benefits paid by Plaintiff, all the while the Defendants have held back millions of dollars needed and due for reimbursement of benefits paid to employees of Sentosa SNFs.  The Defendants also ignored reserves that must be held in trust by an independent fiduciary for the payment of future benefits for the life of the employees' claims which often run for decades. Instead the Defendants diverted, embezzled, and now laundered the difference between the

amounts paid to the Plaintiff as the carrier and the amounts reported in the Cost Report line item for Workmen's Compensation Insurance.

5.     In summary, the scheme reports Workmen's Compensation Insurance expense in the Cost Reports to the DOH, but then instead of paying the Workmen's Compensation Insurance to a commercial carrier, Sentosa SNFs paid the Workmen's Compensation Insurance to straw persons. The diverted Workmen's Compensation Insurance funds to the straw person were converted to unauthorized personal and illegal uses, diverting and embezzling funds which should have been held in trust by an independent fiduciary to pay benefits to employees of Sentosa SNFs.  The unauthorized personal and illegal uses included laundering the funds stolen out of trust to be used to generate income in otherwise legal businesses owned and controlled by the very people who own and control the very same Sentosa SNFs submitting the Cost Reports that certify the amounts of Workmen's Compensation Insurance funds expensed, stealing from the funds meant to cover benefits for the same employees of Sentosa SNFs for whom the Workmen's Compensation Insurance was intended.

## II.     JURISDICTION AND VENUE

6.     Federal question jurisdiction exists in this case based on preemption of Plaintiffs' claims under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1132(a)). This court has original jurisdiction over ERISA actions and subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345, 29 U.S.C. § 1132(e), 29 U.S.C. § 1001 et seq. and "prohibited transaction penalty proceedings" (as defined in §2570.2(o) under section 502(i) of the ERISA). To the extent

6

that any claim in the Complaint is not preempted, it forms part of the same case or controversy under 28 U.S.C. § 1367(a).

7.     Furthermore, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1338 as Plaintiff's claims arise under Section 43(a) of the Lanham Act 15 U.S.C. §1051 et seq.

8.     In addition, the Court has subject matter jurisdiction over the Racketeer Influenced and Corrupt Organizations Act ("RICO") actions pursuant to 18 U.S.C. § 1964.

9.     Venue is proper in this judicial district pursuant to 18 U.S.C § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this district and *inter alia*, all Defendants reside in New York State and at least one Defendant resides in this district.

10.     Finally, the Court has personal jurisdiction and venue in the U.S. District Court for the Northern District of New York by agreement and supplemental jurisdiction over all remaining parties and claims pursuant to 28 U.S.C. § 1367.

### III.   PARTIES

11.     Plaintiff, Oriska Insurance Company ("Oriska") is a duly organized and existing domestic insurance company chartered and organized under and existing by virtue of the laws of the State of New York and other states with its principal office and place of business in Oriskany, Oneida County, New York, where it is engaged in providing various types of insurance coverage in the State of New York including among others, workers' compensation and employer liability, health and disability insurance.

12.     Defendant Sentosa Care, LLC ("Sentosa") is a limited liability company

founded in 2003 and organized under the laws of the State of New York with offices and principal place of business at 100 Daniel Drive, Webster, NY 14580; 1050 Central Avenue, Woodmere, NY 11598 and 20 Franklin Place, Woodmere, NY 11598. Sentosa manages and operates nursing facilities hereinafter referred to as the Sentosa SNFs. Sentosa SNFs offer specialized care, short and long term rehabilitation, and unique medical, nursing, and rehabilitative programs. All of the Defendants described in Paragraphs 13 through 32 are referred to herein collectively as Sentosa SNFs.

13.     Defendant Avalon Gardens Rehabilitation & Health Care Center, LLC d/b/a Brookside Multicare Nursing Center and Optima Care Smithtown, LLC ("Brookside"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 7 Route 25A, Smithtown, NY 11787.

14.     Defendant Bay Park Center Nursing & Rehabilitation, LLC ("Bay Park"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 801 Coop City Blvd. Bronx, NY 10475.

15.     Defendant Bayview Manor LLC d/b/a South Point Plaza Nursing and Rehabilitation Center ("South Point"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at One Long Beach Road, Island Park, NY 11558.

16.     Defendant Brookhaven Rehabilitation & Health Care Center, LLC ("Brookhaven"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 250 Beach 17th

8

Street, Far Rockaway, NY 11691.

17.     Defendant Eastchester Rehabilitation & Health Care Center, LLC
("Eastchester"), a Sentosa SNF, is a limited liability company organized under the laws of
the State of New York with offices and principal place of business at 2700 Eastchester
Road, Bronx, NY 10469.

18.     Defendant Garden Care Center, Inc ("Garden Care"), a Sentosa SNF, is a
limited liability company organized under the laws of the State of New York with offices
and principal place of business at 135 Franklin Avenue, Franklin Square, NY 11010.

19.     Defendant Golden Gate Rehabilitation & Health Care Center, LLC ("Golden
Gate"), a Sentosa SNF, is a limited liability company organized under the laws of the State
of New York with offices and principal place of business at 191 Bradley Avenue, Staten
Island, NY 10314.

20.     Defendant Little Neck Nursing Home LLC ("Little Neck"), a Sentosa SNF,
is a limited liability company organized under the laws of the State of New York with
offices and principal place of business at 260-19 Nassau Boulevard, Little Neck, NY 11362.

21.     Defendant Little Neck Care Center, LLC ("Little Neck Care"), a Sentosa
SNF, is a limited liability company organized under the laws of the State of New York with
offices and principal place of business at 260-19 Nassau Boulevard, Little Neck, NY 11362.

22.     Defendant Nassau Operating Company, LLC d/b/a Nassau Extended Care
Facility and Nassau Rehabilitation and Nursing Center/Kingsbridge Heights Receiver,
LLC ("Nassau"), a Sentosa SNF, is a limited liability company organized under the laws
of the State of New York with offices and principal place of business at 1 Greenwich Street,

Hempstead, NY 11550.

23.     Defendant New Surfside Nursing Home, LLC ("Surfside"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 22-41 New Haven Avenue, Far Rockaway, NY 11691.

24.     Defendant North Sea Associates, LLC d/b/a The Hamptons Center for Rehabilitation and Nursing ("North Sea"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 64 County Road 39, Southampton, NY 11968.

25.     Defendant Park Avenue Operating Company, LLC d/b/a Park Avenue Extended Care Facility ("Park Avenue"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 425 National Boulevard, Long Beach, NY 11561.

26.     Defendant Pinegrove Manor II, LLC d/b/a Grace Plaza Nursing and Rehabilitation Center ("Pinegrove"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 15 Saint Paul's Place, Great Neck, NY 11021.

27.     Defendant Throgs Neck Operating Company, LLC d/b/a Throgs Neck Extended Care Facility ("Throgs"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 707 Throgs Neck Expressway, Bronx, NY 10465.

28.     Defendant Townhouse Operating Company, LLC d/b/a Townhouse Center

for Rehabilitation & Nursing ("Townhouse"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 755 Hempstead Turnpike, Uniondale, NY 11553.

29.    Defendant Willoughby Rehabilitation & Health Care Center LLC d/b/a Spring Creek Rehabilitation & Nursing Care Center ("Willoughby"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 660 Louisiana Avenue, Brooklyn, NY 11239.

30.    Defendant Woodmere Rehabilitation & Health Care Center, Inc. d/b/a Five Towns Premier Rehabilitation and Nursing ("Woodmere"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 1050 Central Avenue, Woodmere, NY 11598 and as 121 Franklin Place, Woodmere, NY 11598.

31.    Defendant Niskayuna Operating Co., LLC d/b/a Pathways Nursing & Rehabilitation Center ("Niskayuna"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 1805 Providence Avenue, Niskayuna, NY 12309.

32.    Defendant Parkview Care and Rehabilitation Center, Inc ("Parkview"), a Sentosa SNF, is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 5353 Merrick Road, Massapequa, NY 11758.

33.    Defendant Bent Philipson ("Philipson") resides at 22 Pleasant Ridge Road, Spring Valley, NY 10977, is the largest percentage owner of Sentosa SNFs and is named

11

in his individual capacity.

34.     Defendant, Allstate Administrators, LLC d/b/a Allstate ASO ("Allstate") is a limited liability company organized under the laws of the State of New York with offices and principal place of business at 462 Ocean Parkway, Brooklyn, NY 11218.

35.     The single owner, director and officer of Allstate is Samuel Schlesinger who resides at 415 Avenue F, Brooklyn, NY 11218 and is named as a Defendant in his individual capacity.

36.     Defendant Isaac Muller ("Muller") residing at 6 Kaser Terrace, Monsey, NY 10952 is named as a Defendant in his individual capacity.

37.     Rashbi Management, Inc. ("Rashbi") is a New York Corporation with offices at 129 S. 8th Street, Brooklyn, NY and is a named as a Defendant by reason of the fact that it has an interest in the disposition of the funds which are the subject of this action.

38.     US Management, Inc. ("US Management") is a New York corporation with offices at 129 S. 8th Street, Brooklyn, NY and is named as a Defendant by reason of the fact that it has an interest in the disposition of the funds which are the subject of this action.

39.     The corporate Defendants are liable under the doctrine of respondent superior for the breaches of fiduciary duty and other culpable acts committed by their employees and agents herein because each corporate is vicariously liable for acts of their its employees and agents

### IV.     FACTS COMMON TO ALL CAUSES OF ACTION

40.     Defendant Sentosa SNFs have filed Cost Reports, Form RHCF-4 ("Cost Reports") with the DOH for the years 2002 through 2017, audited by Sentosa SNFs'

independent auditors as set forth in the Cost Reports.

41.     Sentosa SNFs agreed at various times from 2004 through 2018 to pay workers' compensation premium to Plaintiff to cover benefits paid to employees of Sentosa SNFs by Plaintiff to fund a loss fund trust to reimburse employee benefits required to be paid long into the future, as well as pay assessments ("NYS Assessments") due from the Sentosa SNFs to the State of New York and a mutually agreed deductible premium to Plaintiff for its operations.

42.     The Sentosa SNFs reported to the DOH expenses for Workmen's Compensation Insurance at data item Part IV, Schedule 6, Column 0157, line 026, of their Cost Reports $71,195,817.00[2] accrued for Workmen's Compensation Insurance for the specific coverage periods that Plaintiff covered the Sentosa SNFs from June 10, 2010 through May 1, 2018 as follows:

>$71,195,817.00 Workmen's Compensation Insurance reported by the Sentosa SNFs in
                 Cost Reports pro-rated to Plaintiff's coverage inception/termination.
>$41,232,180.39 paid by Sentosa SNFs to Plaintiff consisting of:
        >$23,917,933.45 paid for NYS Assessments + deductible premium
        >$17,314,246.94 paid to reimburse benefit payments paid by Plaintiff to
                 employees of Sentosa SNFs through the 3rd quarter 2016 and then
                 reimbursement stopped.
>$29,963,636.61 net should be sitting in trust with an independent fiduciary.

## (See Exhibit 1 and Chart on Page 14)

---

[2] Pro-rated 2010 and 2018 for the specific portion of those years Plaintiff covered. Sentosa SNFs

AVALON GARDENS REHABILITATION & HEALTH CARE CENTER, LLC d/b/a BROOKSIDE MULTICARE NURSING CENTER AND OPTIMA CARE SMITHTOWN, LLC; BAY PARK CENTER NURSING & REHABILITATION, LLC;  BROOKHAVEN REHABILITATION & HEALTH CARE CENTER, LLC; EASTCHESTER REHABILITATION & HEALTH CARE  GARDEN CARE CENTER, INC; LITTLE NECK CARE CENTER, LLC  LITTLE NECK NURSING HOME LLC; NASSAU OPERATING COMPANY, LLC d/b/a NASSAU EXTENDED CARE FACILITY AND NASSAU REHABILITATION AND NURSING CENTER/KINGSBRIDGE HEIGHTS RECEIVER, LLC; NEW SURFSIDE NURSING HOME, LLC; NORTH SEA ASSOCIATES, LLC d/b/a THE HAMPTONS CENTER FOR REHABILITATION AND NURSING; PARK AVENUE OPERATING COMPANY, LLC d/b/a PARK AVENUE EXTENDED CARE FACILITY; PINEGROVE MANOR II, LLC d/b/a GRACE PLAZA NURSING AND REHABILITATION CENTER; THROGS NECK OPERATING COMPANY, LLC d/b/a  THROGS NECK EXTENDED CARE FACILITY; TOWNHOUSE OPERATING COMPANY, LLC d/b/a  TOWNHOUSE CENTER FOR REHABILITATION & NURSING; WILLOUGHBY REHABILITATION & HEALTH CARE CENTER LLC d/b/a SPRING CREEK REHABILITATION & NURSING CARE CENTER; WOODMERE REHABILITATION & HEALTH CARE CENTER, INC. d/b/a FIVE TOWNS PREMIER REHABILITATION AND NURSING; NISKAYUNA OPERATING CO LLC d/b/a PATHWAYS NURSING & REHABILITATION CENTER; PARKVIEW CARE AND REHABILITATION CENTER, INC; SENTOSACARE, LLC



43. **The $29,963,636.61 which belongs in a trust was wrongfully diverted away from the trust for Defendants' own purposes and goals unrelated to workers' compensation benefits. What happened to the $29,963,636.61 which should be in trust with an independent fiduciary?**

44. Employees of Sentosa SNFs have been paid by the Plaintiff $25,547,275.28 for workers' compensation benefits but have only reimbursed the Plaintiff the Plaintiff $17,314,246.94 for benefits June 10, 2010 through May 1, 2018, Exhibit 2, leaving $8,233,028.34 due the Plaintiff as an unreimbursed balance of workers' compensation payments due accumulating since the 3rd quarter 2016 of due to Plaintiff. The benefit payments paid by Plaintiff from June 10, 2010 through May 1, 2018 total of $25,547,275.28 on 996 workers' compensation claims, paid on claims against their employers - Sentosa SNFs. **The $29,963,636.61 the Defendants diverted was intended to be available in trust to reimburse Plaintiff for payment of future benefits to employees of Sentosa SNF's.**

45. Even June 2002 through February 1, 2008 injuries still being treated have stopped being reimbursed by the Sentosa SNFs after November 2012. Employees of Sentosa SNFs have received benefit payments from Plaintiff for workers' compensation from June 2002 through February 1, 2008 and shown on Exhibit 3, but there is a remaining outstanding and unreimbursed balance accumulated on continuing benefit payments which stopped being reimbursed in November 2012 of $2,702,087.64 for injuries and illnesses of employees of Sentosa SNFs from June 2002 through February 1, 2008.

46. An analysis of the use of funds paid by Sentosa SNFs during an illustrative

15

period from February 2011 to April 2014 shows that the Defendants diverted from the Sentosa Plan funds due for statutorily required workers' compensation, to pay for real estate, business acquisitions, capital to support personal interests, payments to insiders. These were the same funds intended to reimburse mandatory workers' compensation coverage, embezzling and converting millions of dollars.

47.     This was all in the face of the Cost Reports certified by the owner and/or operator of each Sentosa SNF and by Sentosa SNFs' CPA auditors as follows:

> "I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations (emphasis added). (This is followed by: signature of facility's officer, title and date)."

The certification is filed electronically on line for each Cost Report.

48.     The Cost Reports also misled the auditors of the Cost Reports set forth at Data Item 9290 for the Sentosa SNFs which were:  Martin Friedman & Co; Martin Friedman CPA, PC; Friedman, Martin & Company; Abbate Demarinis LLP; and Loeb & Troper, LLP.

**V.     RECENT DEFALCATIONS NOW COUPLED WITH LAUNDERING**

49.     On June 11, 2017, a meeting was held with Philipson on behalf of the Sentosa SNFs attending with his attorney, Ira Lipsius. Plaintiff was represented by Michele Casaletta, and Schlesinger was present on behalf of Allstate. The meeting was held at a

restaurant in Teaneck New Jersey to discuss nonpayment of premium from the Sentosa SNFs to Plaintiff. At the meeting, it was confirmed by Philipson in conversation with Schlesinger that the Sentosa SNFs had not paid $3,207,065.92 due to Plaintiff as installments from January to May 2017 for workman's compensation coverage which Plaintiff had renewed for the Sentosa SNFs on January 1, 2017.

50.     Philipson told Casaletta at the June 11, 2017 meeting that the Sentosa SNFs would make future payments directly to Plaintiff by the 15th of each month beginning July 2017, while in the interim Philipson was going to investigate what happened with the $3,207,065.92.

51.     Direct payments from Sentosa SNFs to Plaintiff interrupted the strawman's ability to manipulate funds for Workmen's Compensation Insurance covering employees of Sentosa SNFs.

52.     The $3,207,065.92 was not paid.

53.     On June 16, 2017, Plaintiff canceled the workman's compensation coverage for nonpayment of funding for workers' compensation coverage from January 1, 2017 to June 1, 2017. The amount unpaid for 2017 was $3,207,065.92.

54.     On or about June 22, 2017, Ben Landa called the Plaintiff with his attorney Lipsius on the telephone line and spoke with Sara Oddi, the President of Plaintiff, requesting that Plaintiff reinstate the workers compensation coverage for the Sentosa SNFs, agreeing to pay the $3,207,065.92.

55.     The Sentosa SNFs failed to pay to Plaintiff the $3,207,065.92.

56.     Plaintiff's representative Casaletta met with Defendant Philipson on June 27,

2017 at Philipson's office in Woodmere, New York, in an attempt to collect amounts due from the Sentosa SNFs and Defendant Philipson falsely stated that Defendants would pay the installment payments due from June 1 going forward by the 15th of the month and would pay the unpaid amount of $3,207,065.92 due for June 1 through May 31, 2017 knowing that the Plaintiff had not been paid.

57.     As Mr. Philipson requested, that afternoon on June 27, 2017, Plaintiff reinstated the workers' compensation coverage relying on Philipson's promises but the $3,207,065.92 was not paid and remains unpaid.

58.     Philipson represented and agreed with Casaletta that the Sentosa SNFs would make future payments directly to Plaintiff by the 15th of each month beginning July 2017, while in the interim Philipson was going to investigate what happened with the $3,207,065.92 and make sure that it was paid.

59.     The direct payments began in July 2017 from the Sentosa SNFs to Plaintiff but they became later and later each month, falling a full month late by December 2017 and the $3,207,065.92 has never been paid. Plaintiff did not realize then, that payments direct to Plaintiff interfered with the manipulation of funds intended for workers' compensation insurance to the Sentosa SNFs by the ruse of paying Allstate, nor did Plaintiff know that on May 27, 2017 Philipson/Schlesinger had just undergone a financial examination by the New York State Department of Financial Services on the qualifications of Standard and Preferred Insurance Company  ("S & P") to become licensed as a New York domestic property and casualty insurance Company, On November 30, 2017 Philipson/ Schlesinger completed the process and S & P became licensed. During 2017

18

Standard and Preferred Insurance Holdings, Inc., wholly owned by the Philipson/Schlesinger Family Partnerships, contributed $1,500,000 paid in capital and $8,510,042 of paid in surplus, showing cash as the basis of capitalization, all the while not paying Plaintiff for the first 5 months of 2017 nor maintaining the funds in trust with an independent fiduciary necessary to cover future benefits as actuarially estimated.

60.    Plaintiff has now discovered that in 2012, almost exactly when the first workers' compensation benefit funds disappeared, Defendants were scheming to and did divert funds away from trust and away from the payment of benefits to employees of Sentosa SNFs. The Sentosa SNFs funds have been transferred to and have been used to capitalize S & P for the benefit of and expecting future savings by owning and controlling their own insurance company through Philipson/Schlesinger partnership to utilize the Sentosa SNFs expense funds reported in the Cost Reports as Workmen's Compensation Insurance for the purpose of obtaining future reduction in the cost of workers' compensation premiums. As to the true source of capital and how it was generated and gathered, whether directly or by the use of Workmen's Compensation Insurance expense funds and cash received by the Sentosa SNFs to offset other expenses of the facilities, remains to be uncovered, yet by whatever means, the Defendants by and through Philipson/Schlesinger have stolen to raise capital to support the venture by utilizing and continuing to utilize Plaintiff's credentials, licensing, memberships and authorities as a vehicle to fund up and then launder using funds that should be in trust to cover benefits for employees of Sentosa SNFs.

61.    Beginning in July 2017, Plaintiffs began an investigation in earnest into the

circumstances of the default by the Sentosa SNFs, and while Plaintiff's investigation was underway gathering evidence, on December 21, 2017 the renewal of 2018 Sentosa SNFs coverage was quoted by Plaintiff to Eagle North, the appointed broker of record for the Sentosa SNFs.  Eagle North is owned and/or controlled by Schlesinger.

62.    Plaintiff's quote for 2018 was accepted by Eagle North as the broker of the Sentosa SNFs on December 21, 2017.

63.    Sentosa SNFs paid $2,158,909.27 for January, February and March 2018 from Schlesinger/Eagle North, when Plaintiff received a notice of intent to replace coverage.

64.    Plaintiff continued its investigation into the default by the Sentosa SNFs regarding the $3,207,065.92 and found that the default was part of a larger defalcation involving the Sentosa SNFs that had been perpetrated by various persons with the basic scheme not changing, that is to report Workmen's Compensation Insurance intended for benefits for employees of Sentosa SNFs and then divert, convert and embezzle the funds that were expensed.

65.     What the Plaintiff didn't know at the time was that the Sentosa SNFs were operating a self-insured health, disability and workers compensation benefit plan for employees of Sentosa SNFs, but the funding was not paid through to Plaintiff or properly secured in trust with an independent fiduciary as required by law.

66.    Plaintiff has discovered that the Sentosa SNFs, in funding a self-insured benefit program to provide health, disability and workers compensation benefits, ignored the law that the Sentosa SNFs are required to pay their funding to a recognized independent

fiduciary such as a bank, a trust company, or a private benefit administrator if the Sentosa

SNFs are self-funding the benefits.

67.     Defendants received and controlled the funding designated for Workmen's

Compensation Insurance to Sentosa SNFs, did not hold the funds in a fiduciary capacity,

and diverted funds away from the payment of workers' compensation benefits, the very

wrong that the fiduciary requirements were intended to police to protect against the

defalcations which have occurred.

## VI.     FACTS FROM PRIOR NORTHERN DISTRICT OF NEW YORK CASE NO. 03-CV-01481 AND SUBSEQUENT EVENTS

68.     In 2002 US Management was involved with illicit coverages rolled up under

coverage written by Plaintiff for US Management which included coverage for sub-policies

for the Sentosa SNFs.

69.     On December 12, 2003 Plaintiff sued US Management regarding its clients,

including Sentosa SNFs as sub- policyholders. The lawsuit was commenced in the U.S.

District Court for the Northern District of New York ("NDNY"), Case No. 03-cv-01481,

for violations of the Lanham Act of deceiving, stealing and misappropriating the monies,

property, licensing, authority, and approvals belonging to Plaintiff, while deceiving

Government authorities, the public and consumers in stealing the identity, intellectual

property and funds of Plaintiff intended to pay benefits of employees of Sentosa SNFs.

70.     Muller, the Controller of US Management and the chief accounting officer

for US Management, Inc. from 2002 through 2009, allowed and enabled the hacking of

Plaintiff as complained of in Case 03-cv-01481. The hacking occurred through a Citrix

portal, gained access through US Management's tunnel into Plaintiff using Citrix as an engine and tool to hack into Plaintiff. The proof of these facts has now been discovered, that Muller allowed thieves to access the US Management systems, which in turn gave the access through the Citrix window to the Policy Management and Claims System of Plaintiff through this internet interface to systems and credentialed authentication belonging to Plaintiff to fraudulently write and administer insurance coverages.

71.    Plaintiff possesses intellectual property resulting from the unique and singular attribute of Plaintiff as the sole provider of a fully insured 24-Hour Coverage Program of employee benefits (the "Oriska 24-Hour Coverage Program") offered by Plaintiff as a domestic New York insurance carrier. The Oriska 24-Hour Coverage Program seamlessly provides instant care through a workmen's compensation carrier that is also a licensed health carrier, specializing in workers compensation, health and disability. Plaintiff is singularly licensed with a license for health in its P&C licensing. Health coverage is normally the purview of a life carrier. This gives Plaintiff the ability to provide immediate care regardless if the injury is work-related or not in a cost efficient manner. No other U.S. company is so licensed.

72.    The unusual licensing of Plaintiff for health, disability and workers compensation insurance within the same carrier enables Plaintiff to provide immediate care under its health coverage, returning injured employees to work, avoiding long term worker compensation benefit costs. Employees receive the same medical attention whether the injuries are work or non-work related.

73.    The necessary licenses for the business of accident and health, disability and

workers compensation as specified in paragraphs 3 and 15 of Section 1113(a) of the New York Insurance Law, are required for the loss sensitive Oriska 24-Hour Coverage Program. These licenses were granted by the New York State Department of Financial Services ("DFS") to Plaintiff in 1993. The licenses required rating and form approvals by the DFS pursuant to Insurance Law §2307 and were first approved by the DFS for Plaintiff in 1994, and were revised and ratified in 2003, 2005 and 2007. Plaintiff's membership in the New York Compensation Insurance Rating Board ("NYCIRB"), credentialed with the New York Workers Compensation Board ("WCB"), recognized by New York State by the issuance of licenses under paragraphs 3 and 15 of Section 1113(a) of the New York Insurance Law, were necessary to legally operate this Oriska 24-Hour Coverage Program, Intellectual property of Plaintiff specifically approved by the DFS for Oriska's individual use, not able to be substituted with someone else using Plaintiff's identity.

74.     On November 22, 2002 Plaintiff met with the New York State Department of Insurance, now known as the New York State Department of Financial Services ("DFS") to present a plan to mitigate the fallout caused by the group of interlopers, and forensically determine who were the responsible parties and undertake necessary legal action as may be necessary to mitigate any damage that was caused and ensure there were no victims. The mitigation plan was approved by the DFS with the change of control and management of Plaintiff on January 13, 2003. The central action under the mitigation plan was that which Plaintiff commenced in the NDNY as Case No. 03-cv-01481 against US Management et al December 12, 2003.

75.     On April 3, 2004 Muller agreed to the terms of a settlement in the NDNY

23

Case No. 03-cv-01481 covering the Sentosa SNFs. The Deductible Discount as called for on each policy was to be paid by Sentosa SNFs beginning in 2004 in trust to a bank as the fiduciary trustee as established by agreement with HSBC under New York Regulation 114 (11 NYCRR §126, herein referred to as the 114 Trusts).

76.     On July 1, 2006, Sentosa was appointed the Policy Manager for the Sentosa SNFs, which appointment remained in place until September 24, 2013. The July 1, 2006 Agreement was amended on March 22, 2007 to provide terms allowing for recovery of unreimbursed paid benefits and collateral to secure failure to fund the loss fund to pay future benefits.

77.     On July 30, 2006, the DFS sought and obtained an order from the New York State Supreme Court placing Plaintiff into receivership on grounds that Plaintiff was insolvent as a result of the loss sensitive deductible program written for US Management and its sub- policyholders, Sentosa SNFs among others.

78.     On November 28, 2006, Muller and his agency Broad Coverage Services, Inc. were appointed the agent for the Sentosa SNFs by Philipson.

79.     To resolve issues in the receivership, the July 1, 2006 Agreement was amended on October 18, 2007, substituting Rashbi for US Management Inc. as Administrative Trustee with Sentosa continuing as the Policy Manager of the Program. As security to secure the Program, a trust was set up with HSBC Bank as the independent fiduciary trustee to jointly in aggregate and severally secure Plaintiff as beneficiary of the trust in its absolute and sole discretion in applying all collateral securing the workers'

24

compensation benefit obligations.

80.     Plaintiff was designated the beneficiary of the trusts under NY Regulation 114 to receive collateral for the reimbursement of workers compensation coverage to be held to secure payment of workman's compensation claims. Rashbi became the Administrator of the Sentosa SNFs loss sensitive program and set up a fiduciary New York Regulation 114 Trust.

81.     The most recent 114 Trust is with IDB Bank of New York Trust as Trustee dated April 7, 2014, which Trust is the successor to a TD Bank Trust Agreement dated February 24, 2011 and amended May 15, 2012, and March 19, 2013 (" TD Bank Trust"), which was the successor to a certain HSBC Bank, Rashbi and Plaintiff Trust Agreement dated November 28, 2006 ("Rashbi Trust"), also collectively referred to with this 114 Trusts.

82.     The purpose of the 114 Trusts was to receive loss fund payments from Sentosa SNFs and others into trust for reimbursement to Plaintiff for benefits paid on behalf of Sentosa SNFs, to hold funds as collateral paid in Trust on behalf of employees of Sentosa SNFs jointly and severally pooling funds to cover claims of employees of Sentosa SNFs.

83.     The trust agreements were first submitted by the Plaintiff to the DFS in 2006 in order to obtain approval to enable the disposition of Case No. 03-cv-01481 and to resolve the receivership brought against plaintiff in State Supreme Court which had been brought on grounds that US Management and its clients including the Sentosa SNFs had not provided collateral in a form acceptable to secure reimbursement of workers' compensation benefits. As the matters in litigation proceeded toward trial the form of trust was

resubmitted for approval by the DFS in 2007 using the form of agreement in accordance with New York regulation 114 (11 NYCRR §126). The form of trust was submitted relative to the deductible loss sensitive filing documents submitted and approved by the DFS on December 6, 2007. A subsequent trust form was submitted to the DFS on December 1, 2014 for ratification for use with the loss sensitive deductible program agreed to in the settlement of litigation with the Sentosa SNFs and others on September 24, 2013.

84. In 2008, the NDNY Case No. 03-cv-01481, and the plan to mitigate the fallout from the hacking which occurred in 2002 and 2003, was closed by decision, order and judgment in favor of Plaintiff with the Court retaining jurisdiction of the action.

85. Weber, owner of US Management, fired Muller from US Management in 2009.

86. Then in April 2010, Muller manipulated to become a member of the Board of Directors of Plaintiff and remained on the Board from 2010 through 2012.

87. On June 20, 2010, Muller, while a member of the Board of Directors of Plaintiff, by his company Broad Coverage Services as the appointed agent for the Sentosa SNFs in 2007, approached Plaintiff about resuming coverage for workman's compensation for the Sentosa SNFs.

88. On June 30, 2010, Plaintiff provided insurance coverage at the request of Sentosa as the Policy Manager of the Sentosa SNFs through the SNFs appointed broker, Broad Coverage Services ("Broad"), effective June 10, 2010, with the Policy Manager being Sentosa through September 24, 2013. This is the same loss sensitive coverage provided by Plaintiff to Sentosa SNFs beginning in 2002, with US Management, Inc.

continuing as the Policy Manager until 2006.

89.     However, Muller constructed his own illegal version of the loss sensitive program in violation of 11 NYCRR 33 Managing General Agent (MGA) and NY INS §2120 Fiduciary Capacity of Insurance Agent, by attempting to transfer the risk of the Sentosa SNFs coverage to an offshore reinsurance cell owned by Muller ("Muller reinsurance").

90.     The documents entered into by Muller and Plaintiff were not the documents approved by the DFS for use by Plaintiff, covering the Sentosa SNFs since 2002, not the Oriska 24-Hour Coverage Program.

91.     Muller's reinsurance failed. On October 31, 2012, the DFS found that the Muller reinsurance did not transfer risk and the DFS disallowed credit to the Plaintiff for the Muller reinsurance, recasting Plaintiff's financials and placing all of the liability for the risk for the Sentosa SNF coverage on Plaintiff. The DFS issued an order under Insurance Law §1310 that Plaintiff was financially impaired due to the denial of credit for the Muller reinsurance. Plaintiff had to raise in excess of $8 million and pay it into the capital of Plaintiff to address the impairment.

92.     Beginning in February 2012 the Defendant SNFs stopped funding the loss sensitive program, or so Plaintiff thought because Plaintiff had not been paid, causing Plaintiff to cancel coverage on May 22, 2012. The Sentosa SNFs obtained a restraining order from Supreme Court Kings County, Index Number 10608/12 stopping the cancellation of coverage, which action was dismissed by decision of the court on January

17, 2013.

93.    In the meantime in the summer of 2012, Plaintiff sued the Sentosa SNFs in Supreme Court Oneida County ("Oneida County Lawsuits") for nonpayment of premium, cases: CA2012-001673, CA2012-001674, CA2012-001697, CA2012-001675, CA2012-001676, CA2012-001677, CA2012-001678, CA2012-001687, CA2012-001699, CA2012-001683, CA2012-001701, CA2012-001693, CA2012-001700, CA2012-001698, CA2012-001691, CA2012-001695, CA2012-001694, CA2012-001696, CA2012-001688, CA2012-001685, CA2012-001692, CA2012-001686 and moved for summary judgment.

94.    Sentosa SNFs defended the Oneida County Lawsuits submitting affirmations by Muller, Schlesinger and others now being identified as insiders, that the Sentosa SNF coverage was "loss sensitive" on grounds that the coverage with Plaintiff was a self-insured loss sensitive workman's compensation program and only the deductible premium was required to be paid.

95.    Settlement of the Oneida County Lawsuits (the "9/24/13 Settlement") reaffirmed the obligation of the Sentosa SNFs to reimburse benefits paid within a deductible and provide collateral to secure the collectability of reimbursement for benefits paid by Plaintiff to employees of the Sentosa SNFs.

96.    The Policy Manager for the SNFs beginning in 2006 was Sentosa taking over for US Management as the policyholder for multi-coordinated sub-policies for workers' compensation covering the Sentosa SNFs.

97.    Plaintiff agreed as the beneficiary of the 114 Trusts to receive the funding from Workmen's Compensation Insurance to pay benefits of employees of Sentosa SNFs

and to be held as collateral to secure payment of workman's compensation claims. Rashbi became the Administrative Trustee of the Sentosa SNFs loss sensitive program and set up a fiduciary New York Regulation 114 Trust:

> at HSBC Bank in 2007 as part of the settlement of the federal lawsuit 0481 case and in order to address the receivership issue,
>
> at TD Bank in 2011 for the loss sensitive program established in 2010 after Plaintiff came out of receivership and Sentosa SNFs came back to Plaintiff to resume writing loss sensitive coverage,
>
> at IDB Bank of New York in 2014 as part of the September 2013 settlement of the Oneida County Supreme Court lawsuits,

all for the purpose of securing reimbursement to Plaintiff for benefits paid to employees of Sentosa SNFs, to hold funds to reimburse claims paid.

98.     The Sentosa SNFs, Allstate as the successor Policy Manager to Sentosa, Rashbi as the Administrator, and Plaintiff settled the case on September 24, 2013 by agreeing to pay funds into a 114 Trust to fund the self-insured workman's compensation program to reimburse Plaintiff.

99.     Now in 2017 and in 2018 Plaintiff has learned from reverse constructing accounts in the Cost Reports of the Sentosa SNFs that the Sentosa SNFs reported to the DOH Workmen's Compensation Insurance paid by the Sentosa SNFs, when it was really in fact paid to straw person Allstate regularly throughout the period that Plaintiff covered the Defendant SNFs for workmen's compensation. The monies were held by Allstate with the knowledge of Philipson, not paid through to Plaintiff which alone amounts to

$29,963,636.61. This is without taking into consideration interest, penalties, theft of intellectual property damages, reputation damages, loss of business and profits, impairment of licenses and damage to Plaintiff's enterprise due to the illegal activities of the Defendants all to the damage of Plaintiff.

100.    Philipson, and by vicarious responsibility Sentosa, assisted and caused Sentosa SNFs to submit the Cost Reports for Workmen's Compensation Insurance at Part IV, Schedule 6, Column 0157, line 026, as certified in the Sentosa SNFs' Cost Reports (Form RHCF-4, Cost Reports attached hereto as Exhibit 1, where "Op Cert" stands for Operating Certificate and "DCN" is the Declaration Cost Control Number).

101.    Philipson, and by vicarious responsibility employees at Sentosa, assisted and participated with Sentosa SNFs in preparing and filing Cost Reports reporting Workmen's Compensation Insurance expenses.

102.    At all relevant times, Sentosa was responsible for amassing the data to be included in Cost Reports for Sentosa SNFs.

103.    Allstate billing was a contrivance when in fact the payment was supposed to be to an insurance carrier and was not to a proper self-insured fund to be held in trust by an independent fiduciary.

104.    Workmen's Compensation Insurance reported by Sentosa SNFs were co-mingled with health and disability benefits.

105.    Philipson is in responsible charge of Sentosa and Sentosa SNFs.

106.    Sentosa SNFs submitted the Cost Reports on at least 198 separate occasions

30

from 2010 through the present, see Exhibit 1.

## VII.   CHRONOLOGY OF EPISODES

107.   Upon investigation by the Plaintiff in 2017/18, it has been discovered that beginning in 2010 the Workmen's Compensation Insurance for the coverage issued to the Sentosa SNFs by Plaintiff, was paid by the Sentosa SNF's to Allstate, rather than paid to a Loss Fund to be held for reimbursement of benefit claims paid to employees of Sentosa SNFs and held as security in the Loss Fund in a 114 Trust under NY Regulation 114 (11 NYCRR §126) as agreed in the negotiations on renewal of the terms of administration of the loss sensitive program in 2006/2007, renewed in 2010 and contained in the settlement of the terms of coverage on September 24, 2013.

108.   Evidence has now been discovered that beginning in 2002, Sentosa SNFs were running the same scheme, funding health, disability and workers' compensation benefits into a self-funded plan and diverting, embezzling and converting funds intended to pay Workmen's Compensation Insurance. The episodes over the past 16 years each follow essentially the same factual historical pattern between Plaintiff and the Sentosa SNFs. Now, the Plaintiff has discovered that the Sentosa SNFs, through their agents and employees, manipulated Workmen's Compensation Insurance funding from the Sentosa SNFs, diverting funds to purposes not identified in the Cost Reports submitted by the Sentosa SNFs to the DOH, which has now been identified as evidence of defalcation giving rise to the causes of action raised in this Complaint.

109.   The players and means and methods varied from 2002 to the present but the

31

goals of the scheme remained the same. The cast changed:

> ☐ 2002-2008: US Management covering the Sentosa SNFs

> ☐ 2008-2010: Allstate during the Wausau coverage covering the Sentosa SNFs

> ☐ 2010-2012: Allstate during the Muller sub-scheme covering the Sentosa SNFs

> ☐ 2012-2018: Allstate with Philipson/Schlesinger manipulating, diverting, converting and laundering funds intended for benefits for employees of the Sentosa SNFs.

110.    The episodes are:

> <u>June 2002 through 2008</u>: In June 2002 Plaintiff and the Sentosa SNFs began a 16-year relationship interrupted only by a two-year hiatus in 2008 to 2010 where the Sentosa SNFs were covered by Wausau Insurance, after the Plaintiff forced Philipson to fund a 114 trust with HSBC Bank to cover reimbursement of workers' compensation benefits. Plaintiff had covered the Sentosa SNFs under the US Management coverage from 2002 through 2008 with Sentosa becoming the Policy Manager in 2006. This episode included the June 30, 2004 settlement in Federal Case No. 03-cv-01481, a DFS an order under Insurance Law §1104 (c) suspending Plaintiff's ability to write for 3 years until June 30, 2007 when a receivership brought by the DFS in 2006 regarding the loss sensitive deductible program with US Management and the Sentosa SNFs was dismissed after funding of the 114 Trust with HSBC Bank as the independent fiduciary securing reimbursement of workers' compensation benefits paid by Plaintiff. Upon the resolution with US Management and the Sentosa SNFs the 2006 receivership was dismissed by the State Supreme Court issued a judgment with prejudice, dismissing the DFS receivership with a finding on the record stipulated by the DFS that there was no dishonesty or to untrustworthiness by the

management of Plaintiff, and the dispute over the deductible credit was in accord with the Statement of Statutory Accounting Principles, filed by the final disposition of NDNY Case No. 03-cv-01481 with the Federal Court retaining jurisdiction.

> 2008 through 2009: As a result of this ongoing litigation through 2008, the Sentosa SNFs coverage was canceled and replacement coverage was provided by Wausau Insurance, reference Wausau Bus. Ins. Co. v. Sentosa Care LLC, 10 F. Supp. 3d 444, reversed for lack of jurisdiction 2nd Circuit Court of Appeals 2014.

> June 10, 2010 to 2012: Muller as the agent of Plaintiff, and the Broker of Sentosa and the Sentosa SNF, Muller appointed by Philipson bound Plaintiff to cover and renew the Sentosa SNFs coverages with Sentosa as the Policy Manager.

> 2012 to May 1, 2018: The Sentosa SNFs, Philipson and Schlesinger perpetrated their now much more sophisticated and elaborate scheme during this period to launder funds diverted from Workmen's Compensation Insurance. An insider ("Insider") for purposes of this complaint is used to describe a person who receives monies, property or assets which is not at arms-length aiding in the scheme to defraud, wittingly or unwittingly, as their names may appear herein, along with other insiders not yet known, are identified herein as insiders on the diversion of funds intended for benefits for workers' compensation of employees of Sentosa SNFs.

111.    Identified as Insiders are the Philipson Family Trust, the Schlesinger Family Trust, Gary Baker, Jon Halpern, Israel Ziegelman, Ben Landa, Ira Lipsius, Michael Schweimmer, Stella M. Vilardi, Martin Schwartzman, The Berkshire Group, Spencer Street Realty, Pitterman Trust, Wolf Eisenbach, Raphael A. Weitzner, Chaim Hirsch, Israel

Weber, Joseph Stern, and other persons not yet identified, who were either paid from the scheme, aided in the diversion of funds and assets intended to be held to pay for benefits for injured employees of Sentosa SNFs, or became principals and instrumentalities in the capitalization, development, chartering and licensing of S & P, persons identified as receiving benefit from the scheme and later are principals in S & P and insiders that participated in the scheme and ultimately obtained a position in the takeover vehicle S & P.

112.   The Philipson Family Trust is a holding company which capitalized S & P in joint venture with the Schlesinger Family Trust.

113.   The Schlesinger Family Trust is a holding company which capitalized S & P in joint venture with the Philipson Family Trust.

114.   Gary Baker ("Baker"), a consultant for Allstate and a current member of the Board of Directors of S & P, provided an affidavit in opposition to the litigation described in paragraph 83 of the Complaint sworn to June 17, 2013, identifying Sentosa as a "holding and management company operating affiliated skilled nursing facilities and the 5 boroughs of New York, and facilities located outside of New York", describing Plaintiff as providing to the Sentosa SNFs a "loss sensitive premium program as opposed to a guaranteed cost premium program. The loss sensitive premium program is commonly used for larger workers' compensation insurance procurements, such as the procurement for the Sentosa members, because it allows for a reduction in the premium cost for the insured in exchange for some increased loss risk (i.e. a deductible)". Baker in his affidavit states that Muller "was an insurance broker and that he was acting on behalf of and with the authority to bind

Oriska to the terms of the agreement he had reached with Allstate." Baker states that "Oriska, through Mr. Muller, induced Allstate to enter into an agreement with Oriska for the provision of workers' compensation benefits for the Sentosa Members pursuant to a loss sensitive premium program." Baker confirmed that 27.24% of annual premium was to cover Plaintiff's fixed costs, and the balance was to be applied to a "combined loss fund" and the "Sentosa Members would pay a $1 million deductible per loss claim."

115.    Israel Ziegelman, ("Ziegelman") a member of the Board of Directors of S & P, between 2011 and 2013, received payments by wire transfers from the Sentosa SNFs' funds aggregating hundreds of thousands of dollars, to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

116.    Ben Landa's ("Landa") roll was described herein at Section V. RECENT DEFALCATIONS NOW COUPLED WITH LAUNDERING.

117.    Ira S. Lipsius ("Lipsius") is a current member of the Board of Directors of S & P, has received payments from Sentosa SNFs funds being held to pay workers' compensation benefits, and it would be incredible if Lipsius did not know the origin of the monies paid into capital of S & P in order to qualify to be licensed as an insurance carrier in New York State.  Lipsius is a party-in-interest to the Sentosa SNFs Funds in that Lipsius is a plan service provider providing legal and accounting services to the Sentosa SNFs by payments to Lipsius is out of the Sentosa SNFs funds in trust for the purposes of developing a business enterprise benefiting Philipson and Schlesinger, which transactions with Lipsius

35

for non-plan purposes are prohibited.

118.    In 2012 and 2013, The Berkshire Group received payments by mailed checks, bank transfers and wire transfers from the Sentosa SNFs' funds aggregating millions of dollars, to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

119.    Between 2011 and 2014, Spencer Street Realty received payments from the Sentosa SNFs' funds aggregating at least five million, four hundred ninety thousand, eight hundred fifty-three dollars and ninety-two cents ($5,490,853.92) by check mailed or wire transfer to Spencer Street Realty, in an effort to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

120.    Between 2012 and 2014, Pitterman Trust received payments from the Sentosa SNFs' funds aggregating at least four hundred and seventy-nine thousand, one hundred fifty-nine dollars ($479,159.00), in an effort to further perpetrate the scheme. On January 28, 2012, the Pitterman Trust sold to 1689 49th Street, LLC ("LLC") for $10.00 property located at 1689 49th Street in Brooklyn, NY. The LLC is managed by Samuel Schlesinger who signed on behalf of the LLC. On the same date, Pitterman Trust loaned to LLC $499,949.00 for the premises located at 1689 49th Street. On August 13, 2013, a Satisfaction of the Mortgage is filed.  The last payment to the Pitterman Trust was made the same date, 8/13/2013    from account 483031636617 routing number 2100032 in the amount of $124,998.00 check/wire 2435, in an effort to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs

36

employees.

121.    Between 2011 and 2014 Wolf Eisenbach received payments from the Sentosa SNFs' funds aggregating at least seven hundred and fifty thousand dollars ($750,000.00) in an effort to further perpetrate the scheme. The same property that is discussed in regard to the Pitterman Trust paragraph above, 1689 49th Street was the sold by the 1689 49th St. LLC to Wolf Eisenbach in September 2013, one month after the Pitterman Trust loan to the LLC was paid off. Wolf Eisenbach then sold it back to 1689 49th St LLC on January 8, 2014 in an effort to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

122.    On April 28, 2011 Allstate ASO c/o Raphael A. Weitzner, Esq. 134 Bedford Avenue Suite 616 Brooklyn NY, gave a Loan to Chaim Hirsch for the purchase of 727 Bedford Avenue property in the amount of $55,000.00.  On 3/9/2011 a withdrawal from Allstate's Bank of America account was taken by Raphael Weitzner as Attorney.  A Release was later signed by Israel Weber on October 10, 2011. On March 30, 2017 Allstate Administrators (the successor company to Allstate ASO) loaned to 1153 44, LLC (managed by Joseph Stern) $75,000.00 for property at 1153 44th Street. Samuel Schlesinger, the manager of Allstate, notarized Mr. Stern's signature, in an effort to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

123.    On July 10, 2013 Schlesinger provided a similar affirmation to that of Baker in opposition to litigation to recover premiums on policies issued to the Sentosa SNFs affirming the loss sensitive nature of the Workmen's Compensation Insurance provided to

the Sentosa SNFs by Plaintiff and the loss fund established to receive the balance of the Workmen's Compensation Premium. Between 2011 and 2018, Schlesinger is the same person who in partnership with Philipson and their respective family trusts have utilized the Sentosa SNFs funds being held in trust in a loss fund for the payment of workers' compensation benefits to employees of Sentosa SNFs, these funds were wrongfully diverted to capitalize their new insurance Company. Schlesinger received payments by checks from the wired Sentosa SNFs' funds aggregating millions of dollars, to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

124. On June 17, 2013 Johnathan Halpern ("Halpern") provided a similar affidavit to that of Baker on June 17, 2013 affirming the loss sensitive nature of the Workmen's Compensation Insurance provided to the Sentosa SNFs and the loss fund to receive the balance of the Workmen's Compensation Premium after the payment of NYS Assessments and a deductible premium of 27.4% to Plaintiff to secure future benefit payments to employees of Sentosa SNFs. Between 2011 and 2018, Halpern received payments by mailed checks from the Sentosa SNFs' funds, aggregating millions of dollars, in furtherance of the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

125. A similar affidavit to Baker's was provided by defendant Muller whose roll was described herein at Section VI. FACTS FROM PRIOR CASE NO. 03-CV-01481 AND SUBSEQUENT EVENTS.

126. Between 2011 and 2018, American Plan Administrators LLC received

payments by mailed checks and wire transfers from the Sentosa SNFs' funds aggregating millions of dollars, to further perpetrate the scheme of diverting, converting embezzling funds intended to pay benefits of Sentosa SNFs employees.

127.    Michael Schweimmer operated as a broker for the Sentosa SNFs receiving from Allstate and paying on behalf of the Sentosa SNFs to Plaintiff Workers' Compensation installment premiums to Plaintiff.

128.    Stella M. Vilardi ("Vilardi"), an accountant at SentosaCare LLC and a current member of the Board of Directors of S & P, who for many years was the principal accountant and especially the trusted accountant for Philipson and his interstate nursing home empire expanding into the states of Oklahoma, Texas, Kentucky and other states still unknown, has been the accountant who executed or caused to be posted the transactions that make up the expenses reported in the Cost Reports as Workmen's Compensation Insurance.  Ms. Vilardi paid invoices from Schlesinger to a straw person called Allstate. Ms. Vilardi is a current member of the Board of Directors of S & P with knowledge of the expense transactions of Sentosa SNFs, including but not limited to the expenses reported in the Cost Reports for Workmen's Compensation Insurance, and would have known that the payments were made to Allstate and therefore bogus.

129.    Martin Schwartzman, a current member of the Board of Directors of S & P, formerly a senior advisor to the Superintendent of DFS, with years of regulatory and financial experience with the NYS Department of Insurance and the DFS, was either was

misled or knew of the defalcation by the Sentosa SNFs.

### VIII.   AS AND FOR THE FIRST CAUSE OF ACTION ALLEGING VIOLATIONS UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

#### A.  Violation of RICO Section 1962 (c)

##### 1.   Introduction

130.    Plaintiff re-alleges and incorporates all of the allegations above as if fully set forth herein.

131.    This cause of action is brought against all the Defendants (collectively "the RICO Defendants"), alleging a cause of action under 18 U.S.C. § 1962 (c).

#### 2.  Conducting and Participating in the Affairs of the Enterprise Through a Pattern of Racketeering Activity

132.    From at least 2002 up to and including June, 2018, in the NDNY, and elsewhere, the Defendants, being persons employed by and associated with the Enterprise described herein, did unlawfully, knowingly and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the Enterprise described herein, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of multiple acts of racketeering, indictable under 18 U.S.C. §§ 1343 (wire fraud), 18 U.S.C. § 664 (embezzlement from an employee benefit plan) and 18 U.S.C. § 1956 (money laundering), in violation of 18 U.S.C. § 1962 (c).

#### 3.  The Enterprise

133.    The Defendants herein constitute an "Enterprise" as that term is defined in 18 U.S.C. §1961 (4), that is, a group of individuals and businesses associated in fact, which

engaged in and the activities of which affected interstate commerce.  Each Defendant participated in the operation and management of the Enterprise.

### 4.  The Pattern of Racketeering Activity

#### i.     Wire Fraud (18 U.S.C. §1343)

134.   It was a part of the pattern of racketeering that from at least 2002, and continuing until June, 2018, in the NDNY and elsewhere, Defendants knowingly and intentionally devised and intended to devise a scheme and artifice to defraud, and to obtain money and property from the Plaintiff, by means of false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, and for the purpose of executing such scheme or artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, and pictures, that is, *inter al*ia, DOH annual Cost Reports (Form RHCF-4), in violation of 18 U.S.C. § 1343.

135.   It was part of the scheme to defraud that Sentosa SNFs operated a self-insured health, disability and workers compensation benefit plan, however, Plaintiff was defrauded in that Workmen's Compensation Insurance was not paid through to Plaintiff to be properly secured under NY Regulation 114 (11 NYCRR §126).

136.   It was part of said scheme to defraud that from at least 2003 until June 2018, the Defendants would and did submit false and fraudulent annual Cost Reports to the DOH via interstate wire (electronic filing), for Workmen's Compensation Insurance costs and other employment-related expenses associated with the employees of the Sentosa SNFs.

137.   It was further a part of the scheme to defraud that the Cost Reports included

the costs for Workmen's Compensation Insurance as direct costs in relation to wages of employees of Sentosa SNFs, when in fact, as Defendants well knew and believed, as set forth previously herein, the funds were diverted from payment to the authorized insurance carrier, i.e., the Plaintiff.

138.   It was further a part of the scheme to defraud that such services were not lawfully represented in the billing by Defendants for workers' compensation insurance expense. In fact, the funds were received by the Defendants and then diverted for purposes other than represented to the DOH.

### The 2017-2018 Scheme to Steal Insurance Premiums from Plaintiff

139.   It was part of the scheme to defraud that the Defendants failed to pay workers' compensation premiums from January to June 2017 in the amount of $3,207,065.92.

140.   It was a further part of the scheme to defraud that on June 11, 2017, a meeting was held with Defendant Philipson on behalf of the Sentosa SNFs, attending with his attorney, Ira Lipsius. Plaintiff was represented by employee Michele Casaletta. Defendant Schlesinger attended on behalf of Defendant Allstate.  The meeting was held at a restaurant in Teaneck, New Jersey to discuss nonpayment of premiums owed by Defendants Sentosa SNFs to Plaintiff. At the meeting, it was confirmed by Philipson in conversation with Schlesinger that the Sentosa SNFs had not paid $3,207,065.92 due to Plaintiff as installments from January to May 2017 for workman's compensation coverage which Plaintiff had renewed for the Sentosa SNFs on January 1, 2017.  At the meeting, Defendant

Philipson falsely stated: "I'm current."

141.   It was a further part of the scheme to defraud, that Philipson falsely represented to Casaletta at the June 11, 2017 meeting that the Sentosa SNFs would make future payments directly to Plaintiff by the 15th of each month beginning July 2017, while in the interim Philipson would investigate what happened with the $3,207,065.92.

142.   It was further a part of the scheme to defraud that $3,207,065.92 was not paid and no explanation was received from Defendants. As a result, on June 16, 2017 Plaintiff canceled the workers' compensation coverage for nonpayment of funding for workers' compensation coverage from January 1, 2017 to June 1, 2017.

143.   It was further a part of the scheme to defraud that on or about June 22, 2017, Ben Landa called the Plaintiff, with his attorney Lipsius on the telephone line, and spoke with Sara Oddi, the President of Plaintiff, requesting that Plaintiff reinstate the workers compensation coverage for the Sentosa SNFs, while falsely agreeing to pay the $3,207,065.92.

144.   It was further a part of the scheme to defraud that when Plaintiff's representative Casaletta met with Defendant Philipson on June 27, 2018 at Philipson's office in Woodmere, New York, in an attempt to collect amounts due from the Sentosa SNFs and Defendant Philipson falsely stated that Defendants would pay the installment payments due from June 1 going forward by the 15th of the month and would investigate the unpaid amount of $3,207,065.92 due for June 1 through May 31, 2017.

145.   It was a further part of the scheme to defraud that, Mr. Philipson requested that Plaintiff reinstate insurance coverage. Relying on the false statements of the

43

Defendants including Philipson's false and misleading representations, on the afternoon of June 27, 2017, Plaintiff reinstated the workers' compensation coverage.

146.   It was further a part of the scheme to defraud that the Sentosa SNFs failed to pay to Plaintiff the $3,207,065.92 in insurance premiums.

147.   It was further a part of the scheme to defraud that installment payments were made directly to Plaintiff beginning on July 25, 2017, from the Sentosa SNFs to Plaintiff. However, these payments became later and later each month, falling a full month late by December 2017.

148.   It was further a part of the scheme to defraud that the $3,207,065.92 in workers' compensation premiums owed to Plaintiff for the first 6 months of 2017 were never paid.

149.   It was further a part of the scheme to defraud that the Defendants failed to pay $1.7 million in premium payments from January to May 2018.  This amount was in addition to $3.2 million owed for the first 6 months of 2017.

150.   It was further a part of the scheme to defraud, that in a series of e–mails sent via the internet between March 1 and March 29, 2018, and in response to inquiries from Plaintiff as to when payment would be made, the Defendant Philipson falsely stated, *inter alia*, that he: "Will check".

151.   It was further a part of the scheme to defraud that Defendant Philipson, via internet email on March 29, 2018, demanded copies of the workers' compensation policy (which he already had) as a condition of payment.

152.   It was further a part of the scheme to defraud that the Defendants employed

44

these tactics to lull the Plaintiff into a false sense of security and to hide the fact that the Defendants were plotting to contract with a new insurance carrier.

153.    It was further a part of the scheme to defraud that the Defendants notified Plaintiff in early May 2018 that they intended to cancel the insurance coverage.

154.    It was further a part of the scheme to defraud that the payments directed to Plaintiff interfered with the manipulation of funding to the Sentosa SNFs by the ruse of paying Allstate.

155.    It was further a part of the scheme to defraud that on May 27, 2017, Defendants Philipson and Schlesinger in response to a financial examination by the New York State Department of Financial Services, sought to license Standard and Preferred Insurance Company ("S & P") to become licensed as a New York domestic property and casualty insurance Company.

156.    It was further a part of the scheme to defraud that on November 30, 2017, Defendants Philipson/ Schlesinger completed the process of licensing S&P.

157.    It was further a part of the scheme to defraud, that Standard and Preferred Insurance Holdings, Inc., wholly owned by the Defendants' Philipson/Schlesinger Family Partnerships, contributed $1,500,000 paid in capital and $8,510,042 of paid in surplus to S&P, showing cash as the basis of capitalization, while at the same time failing to pay Plaintiff for the first 6 months of 2017 and not maintaining the funds in trust with an independent fiduciary as required by law.

158.    It was a further part of the scheme to defraud that Defendants replaced the

45

Plaintiff with S&P as their workers' compensation carrier sometime in 2018.

### The Diversion of Accruals for Insurance Funding Scheme

159.    In 2017 and 2018, Plaintiff continued its investigation into the default by the Sentosa SNFs regarding the $3,207,065.92 unpaid premiums and found that the default was part of a larger defalcation involving the Sentosa SNFs that had been perpetrated by various individuals and by various means spanning many years.

160.    It was part of the scheme to defraud that from at least 2003 to at least December 2017, the Defendants would and did submit false and fraudulent annual Cost Reports to the DOH via interstate wire (electronic filing), to report Workmen's Compensation Insurance expenses by the Sentosa SNFs.

161.    It was further a part of the scheme to defraud that the Cost Reports accrued Workmen's Compensation Insurance expenses not paid by the Defendants to the Plaintiff.

162.    It was further a part of the scheme that the Cost Reports included the costs for workers' compensation insurance coverage at Part IV, Schedule 6, Column 0157, line 026, as certified in the Sentosa SNFs' Cost Reports (Form RHCF-4, "Workmen's Compensation Insurance" when in fact, as Defendants well knew and believed, as set forth previously herein, that the funds were diverted from payment to the authorized insurance carrier, i.e., the Plaintiff.

163.    It was a further part of the scheme to defraud that from 2003 up to December 2017, the Sentosa SNFs each submitted approximately sixteen (16) false and fraudulent certified annual Cost Reports (Forms RHCF-4) via interstate wires (electronic filing), in

which each form falsely stated in Part IV, Schedule 6 (Employee Benefits) that the Defendants incurred "Workman's Compensation Insurance" expenses.

164.    It was further a part of the scheme to defraud that the payments were diverted to pay other personal and other business obligations of the Defendants.

165.    It was a further part of the scheme to defraud that the Defendants defrauded Plaintiff out of substantial sums as a result of the diversions.

### The Trust Fund Fraud Scheme

166.    It was part of the scheme to defraud that from 2002 to 2018 the Defendants were not fully funding and were diverting assets from the loss sensitive trust program for workers' compensation benefits previously discussed herein.

### Background

167.    Plaintiff entered into various 114 Trusts under NY Regulation 114 (11 NYCRR §126) to receive collateral for workers' compensation coverage by the Sentosa SNFs to be held to secure payment of workman's compensation benefits. Rashbi Management, Inc. ("Rashbi") became the Administrator of the Sentosa SNFs loss sensitive program and set up a fiduciary New York Regulation 114 Trust.

168.    In 2007, the Defendants entered into a trust agreement with the Defendants at HSBC Bank as part of the settlement of a federal lawsuit (03-CV-01481, NDNY) and to address the receivership issue brought by the New York State Department of Financial Services ("DFS").

169.    A trust was established at TD Bank in 2011 for the loss sensitive program

47

established in 2010 after Plaintiff came out of receivership and Sentosa SNFs came back to Plaintiff to resume writing loss sensitive coverage.

170.   A trust was established at IBD Bank of New York in 2014 as part of the settlement of Oneida County Supreme Court lawsuits brought in 2012.

171.   The Plaintiff and Defendants set up the most recent 114 Trust with IDB Bank of New York Trust as Trustee, which Trust is the successor to a TD Bank Trust Agreement dated February 24, 2011 and amended, May 15, 2012, and March 19, 2013 (" TD Bank Trust"), which was the successor to a certain HSBC Bank, Rashbi and Plaintiff Irrevocable Trust Agreement dated November 28, 2006 ("Rashbi Trust"), collectively referred to as "114 Trusts."

172.   It was the purpose of the 114 Trusts to receive loss fund payments from Sentosa SNFs and others into trust for reimbursement to Plaintiff for benefits paid on behalf of Sentosa SNFs, to hold funds as collateral paid in Trust on behalf of employees of Sentosa SNFs, jointly and severally pooling such funds to cover claims of employees of Sentosa SNFs.

173.   The trust agreements were first submitted by the Plaintiff to the DFS in 2006 in order to obtain approval for the disposition of NDNY Federal Case No. 03-cv-01481 (NDNY), and to resolve the receivership brought against plaintiff in State Supreme Court on grounds that US Management and its clients including the Sentosa SNFs had not provided collateral in a form acceptable to secure reimbursement of workers' compensation benefits. As the matters in litigation proceeded toward trial, the form of trust was resubmitted for approval by the DFS in 2007, using the form of agreement in accordance

48

with New York regulation 114 (11 NYCRR §126). The form of trust was submitted relative to the deductible loss sensitive filing documents submitted and approved by the DFS on December 6, 2007. A subsequent trust with TD Bank was submitted to the DFS on December 1, 2014, for ratification for use with the loss sensitive deductible program agreed to in the settlement of litigation with the Sentosa SNFs and others on September 24, 2013.

174.   Beginning in February 2012 the Sentosa SNFs stopped funding the loss sensitive program and Plaintiff was not being paid, causing Plaintiff to cancel coverage on May 22, 2012. The Sentosa SNFs obtained a restraining order from Supreme Court Kings County, Index Number 10608/12 stopping the cancellation of coverage, which action was dismissed by decision of the same court on January 17, 2013.

175.   The Trusts provide continuing security for the payment of amounts payable regarding certain policies ("Policies") issued by Beneficiary Plaintiff to Policyholders Sentosa SNFs for Workers' Compensation and Employer Liability insurance under a loss sensitive program covered by the Large Risk Rating Option ("LRRO") under the New York Compensation Insurance Rating Board ("NYCIRB") Retrospective Rating Manual as applied to the Coverage by the LRRO and Endorsement WC990602 (11/07) NY attaching to and running with the Policies.

## Scheme

176.   It was a further part of the scheme to defraud that Defendants failed to fully fund the 114 Trust despite the fact that Plaintiffs are still required to pay substantial unreimbursed claims from the 2002-2008 period.

177.   It was a further part of the scheme to defraud that, in September 2013, as part

49

of a settlement of lawsuits brought by Plaintiffs in State Supreme Court in summer of 2012, the Defendants agreed to fund a loss settlement trust (New York Regulation "114 Trust").

178.   It was a further part of the scheme to defraud that, despite the agreement to settle the lawsuit and establish a 114 Trust, the Defendants willfully continued to defraud the Plaintiff by underfunding and diverting assets from the 114 Trust.

179.   It was a further part of the scheme to defraud that the Sentosa SNFs, as analyzed for the Illustrative Period, paid the funds intended for Workmen's Compensation Insurance received by the Sentosa SNFs, to Allstate regularly throughout the period that Plaintiff covered the workers and failed to fund the 114 Trust.

180.   It was a further part of the scheme to defraud, that beginning in 2010 the estimated Deductible Discount on the Workmen's Compensation Insurance issued to the Sentosa SNFs by Plaintiff was paid by the Sentosa SNF's to a straw person, Allstate, rather than paid to a Loss Fund for reimbursement of claims to be held under fiduciary control in a 114 Trust under NY Regulation 114 (11 NYCRR §126) as agreed in the negotiations on renewal of the terms of administration of the loss sensitive program in 2006.

181.   It was further part of the scheme to defraud that the Defendant Muller intentionally failed to fund the 114 Trust from 2012 until May 2013.

182.   It was further a part of the scheme to defraud that Defendant Sentosa SNFs electronically filed annual Cost Reports (Form RHCF-4) with the DOH for the years 2002 through 2017, when in fact, the premiums were diverted to Defendants Allstate and US Management.

183.   It was a further part of the scheme to defraud that the Defendants made funds

50

received from Medicaid, private pay, Medicare and insurance unreachable by Plaintiff to reimburse claims paid on behalf of Sentosa SNFs' employees.

184.   It was a further part of the scheme to defraud that the reimbursements received by the Defendants were diverted from and not used to fully fund the 114 Trusts in the amount of approximately $22,483,416.17.

### ii.   Embezzlement from an Employee Benefit Plan (18 U.S.C. § 664)

185.   It was further a part of the pattern of racketeering activity, that from at least 2012, up to December, 2017, the Defendants, did continuously embezzle, steal and unlawfully and willfully abstract and convert to their own use and the use of others in the approximate amount of $40 million, the moneys, funds, securities, premiums, credits, property and other assets of the Sentosa Plan, an employee welfare benefit plan, subject to Title I of the Employee Retirement Income Security Act of 1974, and of a fund connected with such plan.

186.    The plan assets were converted to uses other than workers' compensation benefits, e.g., *inter alia*, personal and other business obligations of the Defendants.

187.   Defendants diverted plan assets needed to cover workers' compensation in violation of their fiduciary duties to act solely in the interest of the plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them, carry out their duties prudently and pay only reasonable expenses.

### iii.   Money Laundering (18 U.S.C. § 1956)

188.   It was further a part of the pattern racketeering activity that the Defendants

for the purpose of executing, attempting to execute, and in furtherance of the above-described wire fraud scheme, from 2010 through June, 2018, knowing the funds they received from the DOH were proceeds of the scheme to defraud which constituted unlawful activity, the Defendants and other participants known and unknown, conducted and attempted to conduct certain financial transactions affecting interstate commerce that were intended to promote the carrying on of the unlawful activity, by repeatedly depositing those funds in financial institutions, including but not limited to, Bank of America and JP Morgan Chase Bank, all of which are financial institutions engaged in, and whose activities affect interstate commerce, and by repeatedly making interstate payments to the aforesaid Defendants and participants in the scheme with proceeds from the same, in violation of 18 U.S.C. § 1956.

189.    Between 2011 and until at least 2014, as detailed previously in ¶¶ 114 to 125 herein, the Defendants furthered the wire fraud and money laundering scheme by means of investing the proceeds from the unlawful activity in, *inter alia*, purchases of real estate, business loans and the establishment of a new insurance company (S&P).

190.    From May to November 2017, as detailed previously in ¶¶ 155 to 157 herein, the Defendants furthered the wire fraud and money laundering scheme by seeking to license S&P as an insurance company in New York State.  As part of the application process, the Defendants submitted to DFS through the U.S. Mail a Proof of Funds report which stated that the source of capitalization of S&P was solely from certain family partnerships, when, in truth and in fact, the source of the capitalization of S&P was partially

52

derived from the proceeds of the unlawful activity described herein.

191.   The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

### 5.   Injury to Business

192.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962 (c), Plaintiff suffered direct and substantial financial injury to its business in that, *inter alia*, (1) the Defendants diverted required reimbursements from the Plaintiff to unauthorized activities and purposes, and (2) the Defendants having not provided satisfactory collateral in trust with an independent fiduciary, the Superintendent of Insurance issued an order (§ 1310 of the New York State Insurance Law) on February 1, 2013, declaring Plaintiff to be impaired and prohibiting Plaintiff from writing new policies, each of which actions by the Defendants caused Plaintiff substantial financial injury which continues to date, the amount to be determined at trial.

193.   Plaintiff requests that this court enter judgment against the Defendants as follows: actual damages, treble damages and attorneys' fees.

### IX.   AS AND FOR THE SECOND CAUSE OF ACTION ALLEGING VIOLATION UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### A.  Violation of RICO Section 1962 (a)

194.   Plaintiff re-alleges and incorporates all of the allegations above as if fully set forth herein.

195.   This cause of action is brought against all of the Defendants (collectively

"the RICO Defendants"), alleging a cause of action under 18 U.S.C. § 1962 (a).

### 1. Investing Income from Racketeering Activity in the Enterprise

196.   The Defendants used and invested income that was derived from a pattern of racketeering activity in an intestate Enterprise.  Specifically, monies and funds received form DOH, which funds were diverted to other purposes in the Enterprise including personal and business expenses of the Defendants.

197.    The racketeering activity listed above and incorporated herein constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

### 2. Injury to Business

198.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962 (a), Plaintiff has been injured in its business and property in that, *inter alia*, (1) the Defendants directed required reimbursements from the Plaintiff to unauthorized activities and purposes, and (2) Plaintiff suffered direct and substantial financial injury to its business in that the Defendants having not provided satisfactory collateral in trust with an independent fiduciary, the Superintendent of Insurance issued an order (§ 1310 of the New York State Insurance Law) on February 1, 2013, declaring Plaintiff to be impaired and prohibiting Plaintiff from writing new policies, each of which actions by the Defendants caused Plaintiff substantial financial injury which continues to date, the amount to be determined at trial.

199.   Plaintiff requests that this court enter judgment against the Defendants as

follows: actual damages, treble damages and attorneys' fees.

## X.   AS AND FOR THE THIRD CAUSE OF ACTION ALLEGING VIOLATION UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### A.  Violation of RICO Section 1962 (d)

200.   Plaintiff re-alleges and incorporates all of the allegations above as if fully set forth herein.

201.   This cause of action is brought against all the Defendants (collectively "the RICO Defendants"), alleging a cause of action under 18 U.S.C. § 1962 (d).

### 1. Conspiracy to Invest the Proceeds of Racketeering Activity in the Enterprise and to Conduct and Participate in the Affairs of the Enterprise Through a Pattern of Racketeering Activity

202.   From at least 2002 until at least June, 2018 in the NDNY, and elsewhere, the Defendants, being persons employed by and associated with the Enterprise described herein, did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree together with each other, and with others whose names are both known and unknown, to (1) use and invest the income derived from the racketeering activity described and incorporated herein in the establishment and operation of the Enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, and, to (2) conduct and participate, directly and indirectly, in the conduct of the affairs of the aforementioned Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of multiple acts indictable under 18 U.S.C. §§ 1343 (mail fraud), 18 U.S.C. 664 (embezzlement from an employee benefit plan), and 18 U.S.C. 1956 (money laundering),

in violation of 18 U.S.C. §§ 1962 (d), (a) and (c).

203.   The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate Enterprise and conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity.

204.   The Defendants, *inter alia,* used the monies and funds received form DOH, which funds were owed to the Plaintiff, in the conduct, operation and management of the Enterprise.

205.   The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. Such conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962 (a) and (c), in violation of 18 U.S.C. § 1962 (d).

## 2. Injury to Business

206.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962 (d), Plaintiff suffered direct and substantial financial injury to its business in that, *inter alia*, the Defendants diverted required reimbursements from the Plaintiff to unauthorized activities and purposes, and (2) the Defendants having not provided satisfactory collateral in trust with an independent fiduciary, the Superintendent of Insurance issued an order (§ 1310 of the New York State Insurance Law) on February 1, 2013, declaring Plaintiff to be impaired and prohibiting Plaintiff from writing new policies, each of which actions by the Defendants caused Plaintiff substantial financial injury which continues to date, the amount

to be determined at trial.

207.   Plaintiff requests that this court enter judgment against the Defendants as follows: actual damages, treble damages and attorneys' fees.

## XI.   AS AND FOR A FOURTH CAUSE OF ACTION UNDER THE LANHAM ACT

208.   All the allegations previously stated are re-alleged and incorporated herein.

209.   Under the doctrine of respondent superior, Sentosa and Sentosa SNFs are liable for and have benefited from the misappropriation by Philipson and others stealing Plaintiff's trade secrets, intellectual property and approved credentials to act in relation to health, disability and workman's compensation in a Oriska 24 Hour Coverage Program along with Plaintiff's capital to convert and divert payment intended for Workmen's Compensation Insurance by virtue of hiding, diverting, embezzling, and otherwise failing and refusing to reimburse Plaintiff for benefits paid to employees of Sentosa SNFs.

210.   It was part of the scheme to defraud for Philipson to actively participate in the Oneida County lawsuits benefiting the transfer by Muller of trade secrets and funds of Plaintiff.

211.   It was part of the scheme to defraud under New York common law principles of respondeat superior, that Sentosa, Philipson, and vicariously Sentosa SNFs, are liable for the wrongful conversion of trade secrets, funds and related assets converted by Philipson in an amount to be determined at trial. Thus, Sentosa SNFs and Sentosa have wrongfully benefitted from misappropriation of plaintiff's property.

212.   It was part of the scheme to defraud to constitute false designation of origin,

false descriptions and representations, and false advertising in commerce by Defendants'
activities in violation of § 43(a) of the Lanham Act, 15 U.S.C.§1125 (a)(1)(A) and (B).
False Advertising 15 U.S.C. § 1125 (a)(1)(A) and (B).

213.   It was part of the scheme to defraud to deceive violating the Lanham Act by
evidence of (1) [a] false or misleading statement of fact about the origin and credentials
stolen by Defendants; (2) the statement deceived or had the capacity to deceive a substantial
segment of potential consumers; (3) the deception was material; (4) the deception is in
commerce affecting interstate commerce; and (5) the Plaintiff has been injured and
Defendants' activities have caused confusion as to the origin, sponsorship, or approval of
the services offered by Defendants under Plaintiff's identity, all in violation of Section 43(a)
of the Lanham Act, 15 U.S.C. § 1125(a).

214.   It was part of the scheme to defraud, in the Defendants have made, and
continue to make untrue, false, deceptive or misleading misrepresentations, misstatements
and material omissions regarding the legality of Defendant's operation of a health,
disability and worker's compensation self-insurance program using Plaintiff's proprietary
licenses and approvals issued to it specifically as alleged in this Complaint.

215.   It was part of the scheme to defraud for Defendants to materially deceived
Plaintiff and lull Plaintiff into believing that the Defendants were living up to their
agreements to place funds in trust when all the while funds to the Sentosa SNFs for
Workmen's Compensation Insurance were being diverted, secreted, embezzled and then

aundered into a clone of Plaintiff.

## XII.   AS AND FOR A FIFTH CAUSE OF ACTION ALLEGING ERISA VIOLATIONS

216.   All the allegations previously stated are re-alleged and incorporated herein.

217.   Plaintiffs bring this action for declaratory judgment, preliminary and permanent injunctions, imposition of a constructive trust, restitution, and disgorgement, pursuant to § 502 of the Employee Retirement Income Security Act of1974 ("ERISA"), 29 U.S.C. § 1132, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

218.   The Employee Retirement Income Security Act (ERISA), codified at 29 USC § 1001 et seq., has governed "employee welfare funds, which are defined, 29 USC§1002(1) as: any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, or death.

219.   It was part of the scheme to defraud to operate a plan, fund, or program which was heretofore or is hereafter established or maintained by the Sentosa SNFs, for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise health, disability and workers' compensation (the "Sentosa Plan").

220.   Each of the Sentosa SNFs are plan sponsors ("Plan Sponsors") under the Sentosa Plan, employer-sponsored plan governed by ERISA, in which employees

59

participate.

221.   Philipson and Schlesinger are parties-in-interest and/or fiduciaries, along with a myriad of persons identified as insiders or not yet identified, providing services to the Sentosa Plan pursuant to ERISA § 3(14), 29 U.S.C. § 1002(14) which defines a "party in interest" to an employee benefit plan, in relevant part, as:"(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan; (B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; and (D) an employee organization any of whose members are covered by such plan.

222.   The Plaintiff is a party-in-interest to seek relief on behalf of the Sentosa Plan to recover funds that are required to be held in trust by an independent fiduciary to provide benefits for employees of the Sentosa SNFs.

223.   Plaintiff has standing to sue under ERISA Section 502(a)(2) for relief under ERISA Section 409, 29 U.S.C. § 1109 and Section 409(a) which provides that a fiduciary is personally liable to a plan for any losses the plan suffers as a result of the fiduciary's breach and must restore to the plan any profits the fiduciary realized as a result of a misuse of plan assets to the damage of Plaintiff who has paid benefits to employees of Sentosa SNFs which the Defendants have failed and/or refused to reimburse. Consistent with the provisions of this title, 29 USCS § 1104, if an administrator is not so designated, it is the Plan Sponsors.

224.   ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Sentosa Plan and parties in interest. Specifically, ERISA § 406(a) (1), 29 U.S.C. § 1106(a)

(1), provides: "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect(A) sale or exchange, or leasing, of any property between the plan and a party in interest;(B) lending of money or other extension of credit between the plan and a party in interest;(C) furnishing of goods, services, or facilities between the plan and a party in interest;(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or,(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title".

225.   In violation of ERISA's fiduciary duty and prohibited transaction provisions, Defendants as part of the scheme to defraud, the Sentosa SNFs, Sentosa and Allstate in the operation of the Sentosa Plan diverted and underfunded the Sentosa Plan for workers' compensation, health and disability benefits identified in the agreement between Sentosa SNFs and Allstate, diverting Plan assets needed to cover workers' compensation in violation of their fiduciary duties to act solely in the interest of plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them; carry out their duties prudently; and paying only reasonable plan expenses. Here, the Sentosa SNFs, Sentosa and Allstate were by various false representations entrusted with benefit funds, and once having obtained possession of the funds they were converted it to uses other than workman's compensation benefits, purposes not contemplated when the Sentosa SNFs reported Workman's Compensation Insurance costs.

226.   Under 29 U.S.C.S. §1003(b)(3), the Sentosa Plan of the Sentosa SNFs is not exempt from ERISA as it was not maintained solely for the purpose of complying with

applicable workman's compensation laws, therefore the Plan is preempted by ERISA, 29 U.S.C.S. § 1001 et seq.

227.   Under ERISA, the Sentosa Plan is required to be administered "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of … providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1).

228.   A benefit provider such as Plaintiff, is entitled to seek recovery from the Sentosa SNFs as plan sponsors and from the Sentosa Plan for the monies it expended to pay benefits to employees of Sentosa SNFs who were injured on the job, under the doctrine of equitable subrogation.

229.   ERISA and New York State law recognize the separate and independent right of contractual subrogation and reimbursement. This right is based on an agreement between the Plaintiff and the Plan Sponsors.

230.   It was part of the scheme to defraud for the Sentosa Plan to function as a self-funded plan composed of affiliated employers where risks are distributed among the participating employers by Sentosa as the Manager of the Sentosa SNFs. Upon information and belief, the Sentosa Plan is self-funded by each Sentosa SNF sharing of risk where the funding was pooled and managed by Sentosa as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1)(a) of ERISA, as a result of exercising control and management over fund assets under 29 U.S.C. 186(c)(5) "employee benefit plans" within the meaning of 29 U.S.C. 1002(37), (1), (2) and (3). Defendants Sentosa and Sentosa SNFs are fiduciaries under ERISA 32.

231.   Under ERISA, a fiduciary is required to "discharge his duties with respect to

a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to [them]." 29 U.S.C. §1104(a)(1).

232.   It was part of the scheme to defraud that the Sentosa SNFs, Sentosa, and Philipson as fiduciaries used fund assets to satisfy other personal or business obligations or otherwise underfunded the obligations, they have breached their fiduciary duty under ERISA. Under ERISA, any person who is a fiduciary with respect to the plan who breaches any one of the responsibilities, obligations, or duties imposed upon fiduciaries is personally liable "to make good to such plan any losses to the plan resulting from each such breach, and to restore the plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary..." 29 U.S.C. §1109(a).

233.   The payment of premiums by employers Sentosa SNFs on behalf of employees to a fund is substantial evidence that plan, fund or program was established by the Sentosa SNFs as Plan Sponsors.

234.   The Sentosa Plan meets the five prerequisites for ERISA welfare benefit plan: (1) plan, fund or program, (2) established or maintained, (3) by employers Sentosa SNFs, (4) for purpose of providing health, disability and workers compensation benefits, (5) to participants or their beneficiaries of the Sentosa SNFs.

235.   It was part of the scheme to defraud or Defendants to willfully and intentionally use fund assets for purposes other than the exclusive purpose of providing benefits to fund participant and beneficiaries, Defendants Sentosa SNFs, Sentosa, Allstate, and the persons acting on behalf of such Defendants, breached their fiduciary duties.

236.   Plaintiff seeks monetary and equitable relief, penalties, and, attorney fees,

costs, and disbursements incurred as a result of Defendants' acts and omissions related to Plaintiff's claims for reimbursement of accidental death benefits, violations of Defendants' fiduciary duties.

237.   It was part of the scheme to defraud for Sentosa SNFs and Sentosa to breach their fiduciary duties under ERISA by failing to make or arrange for payments for the beneficiaries' treatments and services for workman's compensation benefits and failure to maintain plan assets in a fiduciary capacity, breached its fiduciary duties under ERISA by failing to reimburse for the beneficiaries' treatments and services and failure to deposit Plan assets in Trust.

238.   As a result of Sentosa SNFs' breach, the Plaintiff is subrogated to the rights to be reimbursed for benefits provided to Sentosa Plan beneficiaries who have suffered and will continue to suffer damages including, but not limited to, not having the costs of medical treatment paid.

239.   It was part of the scheme to defraud using the superior knowledge and experience of Philipson at Sentosa, including, but not limited to, Sentosa's role in making and purchasing insurance coverages and making recommendations with respect to, and facilitating the placement of health, workman's compensation and disability coverage.

240.   It was part of the scheme to defraud, as a result of the relationship between Defendants Sentosa SNFs, Sentosa and Allstate, including, but not limited to, their role and superior knowledge and information regarding the occupational and non-occupational benefit plans for Sentosa SNFs' employees, and the member ownership in the SNFs in common with Sentosa makes the Sentosa SNFs knowledgeable that the Cost Reports were

64

deceptive in representing to the DOH that payment to Allstate was payment to a commercial insurance carrier which the DOH relied upon.

241.   It was part of the scheme to defraud and Sentosa SNFs were aware that the DOH was relying upon the representations in the Cost Reports that the Sentosa SNFs were payment of premium paid to a commercial carrier for Workmen's Compensation Insurance, which Allstate is not, resulting from the relationship between the Sentosa SNFs and Sentosa, including, but not limited to, its role in making recommendations with respect to Sentosa SNFs' purchase of workers' compensation coverage as instructed by Sentosa,

242.   Sentosa SNFs and Sentosa owe Plaintiff and the employees of Sentosa SNFs a common-law fiduciary duty to act in good faith.

243.   It was part of the scheme to defraud that by reason of Sentosa's superior knowledge and experience in the nursing home industry, the auditors and the DOH would rely on statements regarding coverages, especially regarding payments which have been specifically reported to the DOH.

244.   As a direct and proximate cause of Defendants' breaches, plaintiff has suffered damages including, but not limited to, additional and ongoing life of claim costs for medical treatment and reimbursement of lost wages of employees of Sentosa SNFs which are unable to be reimbursed out of Trust funds.

245.   Defendants Sentosa, Allstate and Sentosa SNFs breached duties of care by negligently making false statements in Cost Reports to the DOH regarding its payments for workman's compensation which included statements that workman's compensation

coverage was being provided by Allstate as represented by its billing to the Sentosa SNFs.

246.   Defendants' fraudulent scheme is premised on their unlawfully siphoning the Defendant SNFs Medicaid, private pay, Medicare and insurance funds reported as intended for Workman's Compensation Insurance, by paying employee benefits to a fund where funds which are devoted to workman's compensation services and costs were diverted by failing to pay the Plaintiff.

247.   By virtue of the acts described above, the Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay money to the Government, and/or knowingly concealed or knowingly and improperly received funds which were not used for their intended and represented purpose.

248.   Sentosa SNFs or their appointed designees did not pay Plaintiff and Plaintiff was not otherwise funded by submitting false reports for premiums for Workmen's Compensation Insurance was never paid to a commercial insurance carrier.

249.   Through the above-described conduct, Sentosa SNFs knowingly presented or caused to be presented false or fraudulent reports for payment or approval; and/or made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved; and/or made, used, or caused to be made or used, false record or statement to conceal that Defendants are diverting funds paid for Workman's Compensation Premium.

250.   Specifically, Sentosa SNFs: (1) filed annual Cost Reports with the New York DOH, which among other things, falsely and impliedly certified that Defendants were in

compliance with all applicable laws and regulations.

251.    Sentosa and Allstate's contrivance was that Allstate is the Workmen's Compensation Insurance carrier.

252.    It was part of the scheme to defraud for Sentosa SNFs to falsely report to the DOH something they did not provide by submitting claims with an incorrect description of goods or services provided or a request for goods and services never provided.

253.    It was part of the scheme to defraud to provide false certification where the act of submitting false reports themselves imply compliance with governing rules that are a precondition to payment.

254.    It was part of the scheme to defraud for Sentosa SNFs to submit claims falsely representing and certifying compliance with a statute, regulation, or contractual provision, compliance being a precondition to government payment of the claim.

255.    It was part of the scheme to defraud for the Defendants to fail to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

256.    When, as Defendant well knew, such services were not lawfully represented in the billing by Allstate, yet the Defendants engaged in a continuous and pervasive pattern of deceiving the DOH by Defendant's filing false Cost Reports when in fact the pattern and practice was to receive the monies and then divert the reimbursement for purposes other than as represented to the DOH.

257.    By reason of the acts of Defendants alleged herein, Plaintiff has suffered, is suffering and will continue to suffer damages and irreparable damage and, unless said

Defendants are restrained from continuing these wrongful acts, the damage to Plaintiff will increase.

## XIII.   AS AND FOR THE SIXTH CAUSE OF ACTION ALLEGING CONVERSION

258.   All the allegations previously stated are re-alleged and incorporated herein.

259.   Defendants and other participants known and unknown, wrongfully converted to their own use funds stolen from trust through the fraudulent schemes herein set forth by wrongfully retaining that money, and conspired to do so.

260.   Plaintiff has been damaged as a result of the conversion in an undetermined amount in excess of fourteen million dollars ($14,000,000.00)

## XIV.   AS AND FOR THE SEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT

261.   All the allegations previously stated are re-alleged and incorporated herein.

262.   Defendants and other participants known and unknown, have held and continue to hold funds stolen from trust from the Plaintiff without right thereto.

## XV.   AS AND FOR THE EIGHTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

263.   All the allegations previously stated are re-alleged and incorporated herein.

264.   Defendants owed employees of Sentosa SNFs and the Plaintiff a fiduciary duty, and owed a duty of loyalty to the, and an obligation to administer diligently and carefully the affairs safeguard the property and assets in trust; to prevent trust assets from being wasted, stolen or squandered; and to keep honest, accurate and correct accounts of all affairs, business and transactions of trust monies; to make and publish true and accurate accounts and statements of the affairs of trust and to perform

faithfully and diligently all the duties devolving upon Defendants.

265.    As set forth herein, Defendants have breached their fiduciary duties owed to the employees of Sentosa SNFs and Plaintiff, and have failed to perform the fiduciary duties imposed upon them, and did not give proper care or oversight to the trusts funds in a skillful, careful, and diligent manner; but on the contrary, knowingly and fraudulently permitted opportunities, monies, property, and effects of those trust funds to be taken, wasted, and squandered, and transferred the opportunities, monies and other assets of those corporations for Defendants' own personal account and for Defendants' own personal use, and for the benefit of third parties, to the detriment of the employees of Sentosa SNFs and Plaintiff, accomplished the above by engaging in a deliberate course of conduct and scheme as set forth herein.

## XVI.  AS AND FOR THE NINTH CAUSE OF ACTION THE AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES

266.    All the allegations previously stated are re-alleged and incorporated herein.

267.    Defendants knowingly induced and participated with the Sentosa SNFs in those breaches of fiduciary duties by providing substantial assistance to those Defendants and had actual knowledge of the breaches of fiduciary duties by Defendants

268.    To the extent that certain of the Defendants were not the primary violators with respect to particular acts and practices alleged as a basis for liability herein, they aided and abetted their co-defendants who were the primary violators.

269.    Each Defendant also enabled and substantially assisted in the accomplishment of one or more of the breaches of duty and wrongs committed by the

primary violators constituting the actionable wrong in each claim, and thereby substantially assisted in the wrongs, crimes, torts, statutory violations and unfair practices alleged herein.

270.    Because of their aiding and abetting of each other's wrongs and illegal conduct, which contributed to the losses suffered by Plaintiffs and to the injury of the employees of Sentosa SNFs,, Defendants are jointly liable for all of the primary violations alleged herein that they knowingly and substantially assisted in accomplishing. By reason of the foregoing, the aiding and abetting of the breaches of fiduciary duties has proximately caused damages to the employees of Sentosa SNFs and Plaintiff in an amount as of yet undetermined but estimated to be in excess of thirty million dollars ($30,000,000.00).

## XVII. AS AND FOR THE TENTH CAUSE OF ACTION FOR A CONSTRUCTIVE TRUST

271.    All the allegations previously stated are re-alleged and incorporated herein.

272.    Defendants with the assistance of the others known and unknown, knowingly received monies and assets either directly or indirectly from the Defendant's Sentosa SNFs, under circumstances such that those Defendants knew that the receipt of the moneys and assets was unlawful and improper.

273.    The exact amount of monies and assets received by the Defendants is unknown, but is believed to be in excess of thirty-one million dollars ($31,000,000.00).

274.    The conduct of the Defendants constituted intentional acts of wrongdoing undertaken by Defendants with actual malice and in wanton and willful disregard of the rights of the employees of Sentosa SNFs and Plaintiff,

275.    Defendants are trustees for the employee SNFs and Plaintiff of the monies

and assets received, directly or indirectly, and the Plaintiff is entitled to a return of those monies and assets.

276.    Accordingly, a constructive trust should be imposed and an accounting of the money ordered.

## XVIII.    AS AND FOR THE ELEVENTH CAUSE OF ACTION FOR AN ACCOUNTING

277.    All the allegations previously stated are re-alleged and incorporated herein.

278.    Plaintiff is entitled to an accounting of all funds expended by Defendants which belong to the Plaintiff and which have been misappropriated, diverted and stolen.

## XIX.   PLAINTIFF IS ENTITLED TO THE BENEFIT OF ERISA'S AND RICO'S FRAUD OR CONCEALMENT LIMITATIONS PERIOD

279.    ERISA's statute of limitations provision for fiduciary breach claims provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation, 29 U.S.C. § 1113; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir.1998).

280.    There are many additional reasons why Plaintiffs could not have learned facts sufficient to bring a claim until Plaintiff was forced in 2017 to investigate and uncover what the Defendants did with the premiums in 2017 which lead to the uncovering of the defalcations which were hidden ostensibly by secrecy directives by government authorities and regulators.  Further delay was caused by the Defendants obstinance and refusals to provide evidence and discovery in state court collection litigation to simply discover the disposition of premium on the coverages written by Plaintiff for the Sentosa SNFs. It wasn't until the Plaintiff took extraordinary steps to discover the Cost Reports filed by the

Sentosa SNFs with the DOH that Plaintiff discovered the full depth, import and extent of the defalcation by the Sentosa SNFs.

## XX.   RELIEF

WHEREFORE, Plaintiff requests that this Court by reason of the foregoing enter:

Judgment for immediate reimbursement of Plaintiff for benefits paid to employees of Sentosa SNFs of $8,233,875.63 for injuries that occurred between June 10, 2010 and May 1, 2018 and $2,702,087.64 for injuries and illnesses of employees of Sentosa SNFs from June 2002 through February 1, 2008.

Judgment placing in trust to secure payment of future benefits the sums of $22,483,416.17 for injuries that occurred between June 10, 2010 and May 1, 2018 and $991,589.60 for injuries that occurred between June 2003 and February 2, 2008.

Judgment holding Defendants to account to the Plaintiff for the moneys received as alleged herein.

Judgment in and upon the First Cause of Action, for violation of 18 U.S.C.§ 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c), and for the costs of the suit including reasonable attorneys' fees in accordance with 18 U.S.C. §1964(c) in an undetermined amount not less than thirty-one million dollars ($31,000,000.00) plus interest.

Judgment in and upon the Second Cause of Action, for violation of 18 U.S.C.§ 1962(a), the sum duly trebled in accordance with 18 U.S.C. § 1964(a), and for the costs of the suit including reasonable attorneys' fees in accordance with 18 U.S.C. §1964(a) in an undetermined amount not less than thirty-one million dollars

($31,000,000.00) plus interest.

Judgment in and upon the Third Cause of Action, for violation of 18 U.S.C.§ 1962(d), the sum duly trebled in accordance with 18 U.S.C. § 1964(d), and for the costs of the suit including reasonable attorneys' fees in accordance with 18 U.S.C. §1964(d) in an undetermined amount not less than thirty-one million dollars ($31,000,000.00) plus interest.

Judgment in and upon the Fourth Cause of Action alleging fraud, declaring that the transaction as set forth therein were made in fraudulent disregard of the rights of the obligation of the Plaintiffs, plus punitive damages and for the costs and disbursements of this action, including reasonable attorneys' fees.

Judgment in and upon the Second, Fifth, Sixth, Seventh, Eighth and Ninth Cause of Action, damages in an amount to be determined plus interest, punitive damages, and the costs and disbursements of this action, including reasonable attorneys' fees.

Judgment declaring the Imposition of a constructive trust and accounting pursuant to the Tenth Cause and Eleventh Causes of Action.

Judgment against all of the named Defendants, holding each Defendant liable, jointly and severally in principal contributions due, as well as the interest, liquidated damages and attorneys' fees and costs on said amounts as found to be owed by Defendant Company in this matter.

Judgment declaring Declare that Sentosa SNFs, Sentosa and Phillipson, are fiduciaries of the funds reported to the DOH as Workmen's Compensation Insurance,

by virtue of their exercise and control of assets and that such Defendants be found in breach of their fiduciary duties.

Judgment on behalf of the general public and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.

Judgment of restitution of all amounts, paid and unpaid, obtained by Defendants using the tactics described herein, including interest thereon.

Judgment on behalf of the general public and innocent participants covered by the plan, full restitution and disgorgement of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants by means of the unfair and/or deceptive practices complained of herein.

Judgment directing that Plaintiff be awarded all reasonable expenses that were necessarily incurred in prosecution this action, plus all reasonable attorneys' fees and costs, and for such other relief as this Court deems just and proper.

Dated: August 28, 2018

_____
Antonio J. Faga, Esq.
Of Counsel to:
KERNAN PROFESSIONAL GROUP, LLP
Bar No. 101598
1310 Utica Street,
PO Box 750
Oriskany, New York 13424
Telephone: (315) 736-0816

VERIFICATION

STATE OF NEW YORK          )
                                                  ) ss.:
COUNTY OF ONEIDA          )

Sarah E. Oddi, being duly sworn, deposes and says that deponent is the plaintiff in the within

action, that deponent has read the foregoing complaint and knows the contents thereof; that the

same is true to deponent's own knowledge, except as to the matters therein stated to be alleged

on information and belief, and that as to those matters deponent believes it to be true.

_____
Sarah E. Oddi

Sworn to before me this 17ᵗʰ day

of August, 2018

_____
Notary

MIRSAD HODZIC
Notary Public, State Of New York
No. 01HO6076713
Qualified In Oneida County
Commission Expires 7/1/ 2022

EXHIBIT  1

| Name | OPCert# | Date | DCN | NYS Dept. of Health RHCF Cost Report Data / Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| Baypark | 7000389 | 12/31/10 | 12081119 | 1,469,715.00 | 76,513.00 [1] |
| Baypark | 7000389 | 12/31/10 | 12081119 | 1,469,715.00 | 740,968.00 [1] |
| Baypark | 7000389 | 12/31/11 | 22141447 | 1,475,715.00 | 1,475,715.00 |
| Baypark | 7000389 | 12/31/12 | 32111120 | 1,475,715.00 | 1,475,715.00 |
| Baypark | 7000389 | 12/31/13 | 42121044 | 1,475,715.00 | 1,475,715.00 |
| Baypark | 7000389 | 12/31/14 | 52241105 | 1,815,352.00 | 1,815,352.00 |
| Baypark | 7000389 | 12/31/15 | 61961342 | 1,497,627.00 | 1,497,627.00 |
| Baypark | 7000389 | 12/31/16 | 71731012 | 1,509,951.00 | 1,509,951.00 |
| Baypark | 7000389 | 12/31/16 | 71731012 | 1,509,951.00 | 1,509,951.00 |
| Baypark | 7000389 | 12/31/16 | 71731012 | 1,509,951.00 | 496,440.00 [1] |

**Baypark**
**06/11/2010**
**05/01/2018**

| | |
|---|---|
| Total Column 2: | 12,073,947.00 |
| Total Collected by Plaintiff: | 5,134,423.56 |
| Total Due: | 6,939,523.44 |

| Name | OPCert# | Date | DCN | | |
|---|---|---|---|---|---|
| Brookhaven | 7003399 | 12/31/10 | 11661622 | 412,691.00 | 21,489.00 [1] |
| Brookhaven | 7003399 | 12/31/10 | 11661622 | 412,691.00 | 208,104.00 [1] |
| Brookhaven | 7003399 | 12/31/11 | 21840936 | 418,691.00 | 418,691.00 |
| Brookhaven | 7003399 | 12/31/12 | 32191553 | 418,691.00 | 418,691.00 |
| Brookhaven | 7003399 | 12/31/13 | 41881442 | 418,691.00 | 418,691.00 |
| Brookhaven | 7003399 | 12/31/13 | 41881442 | 418,691.00 | 418,691.00 |
| Brookhaven | 7003399 | 12/31/15 | 61961051 | 418,691.00 | 418,691.00 |
| Brookhaven | 7003399 | 12/31/16 | 71711044 | 456,726.00 | 456,726.00 |
| Brookhaven | 7003399 | 12/31/16 | 71711044 | 456,726.00 | 456,726.00 |
| Brookhaven | 7003399 | 12/31/16 | 71711044 | 456,726.00 | 150,120.00 [1] |

**Brookhaven**
**06/11/2010**
**05/01/2018**

| | |
|---|---|
| Total Column 2: | 3,386,620.00 |
| Total Collected by Plaintiff: | 2,230,002.69 |
| Total Due: | 1,156,617.31 |

| Name | OPCert# | Date | DCN | | |
|---|---|---|---|---|---|
| Brookside | 5157313 | 12/31/10 | 11821355 | 952,806.00 | 49,590.00 [1] |
| Brookside | 5157313 | 12/31/10 | 11821355 | 952,806.00 | 480,240.00 [1] |
| Brookside | 5157313 | 12/31/11 | 21801511 | 958,806.00 | 958,806.00 |
| Brookside | 5157313 | 12/31/12 | 31680826 | 1,112,919.00 | 1,112,919.00 |
| Brookside | 5157313 | 12/31/13 | 41691423 | 838,806.00 | 838,806.00 |
| Brookside | 5157313 | 12/31/15 | 61661145 | 838,806.00 | 838,806.00 |
| Brookside | 5157313 | 12/31/15 | 61661145 | 838,806.00 | 838,806.00 |
| Brookside | 5157313 | 12/31/16 | 71640955 | 850,806.00 | 850,806.00 |
| Brookside | 5157313 | 12/31/16 | 71640955 | 850,806.00 | 850,806.00 |
| Brookside | 5157313 | 12/31/16 | 71640955 | 850,806.00 | 53,613.00 [1] |

**Brookside**
**06/11/2010**
**01/24/2018**

| | |
|---|---|
| Total Column 2: | 6,873,198.00 |
| Total Collected by Plaintiff: | 3,199,331.29 |
| Total Due: | 3,673,866.71 |

| Name | OPCert# | Date | DCN | 2 - Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| **NYS Dept. of Health RHCF Cost Report Data** | | | | | |
| Eastchester | 7000383 | 12/31/10 | 12021101 | 463,460.00 | 24,130.00 [1] |
| Eastchester | 7000383 | 12/31/10 | 12021101 | 463,460.00 | 233,680.00 [1] |
| Eastchester | 7000383 | 12/31/11 | 22051310 | 469,460.00 | 469,460.00 |
| Eastchester | 7000383 | 12/31/12 | 32241035 | 468,540.00 | 468,540.00 |
| Eastchester | 7000383 | 12/31/13 | 42101503 | 469,460.00 | 469,460.00 |
| Eastchester | 7000383 | 12/31/13 | 42101503 | 469,460.00 | 469,460.00 |
| Eastchester | 7000383 | 12/31/15 | 61901433 | 469,460.00 | 469,460.00 |
| Eastchester | 7000383 | 12/31/16 | 71811218 | 481,460.00 | 481,460.00 |
| Eastchester | 7000383 | 12/31/16 | 71811218 | 481,460.00 | 481,460.00 |
| Eastchester | 7000383 | 12/31/16 | 71811218 | 481,460.00 | 158,280.00 [1] |

**Eastchester**
06/11/2010
05/01/2018

Total Column 2: 3,725,390.00
Total Collected by Plaintiff: 1,805,415.32

Total Due: 1,919,974.68

| Garden Care | 2950316 | 12/31/10 | 11851654 | 236,062.00 | 12,293.00 [1] |
|---|---|---|---|---|---|
| Garden Care | 2950316 | 12/31/10 | 11851654 | 236,062.00 | 119,048.00 [1] |
| Garden Care | 2950316 | 12/31/11 | 21841622 | 242,062.00 | 242,062.00 |
| Garden Care | 2950316 | 12/31/12 | 31981807 | 227,062.00 | 227,062.00 |
| Garden Care | 2950316 | 12/31/13 | 41951159 | 212,062.00 | 212,062.00 |
| Garden Care | 2950316 | 12/31/13 | 41951159 | 212,062.00 | 212,062.00 |
| Garden Care | 2950316 | 12/31/15 | 61851153 | 212,062.00 | 212,062.00 |
| Garden Care | 2950316 | 12/31/16 | 71941649 | 236,657.00 | 236,657.00 |
| Garden Care | 2950316 | 12/31/16 | 71941649 | 236,657.00 | 236,657.00 |
| Garden Care | 2950316 | 12/31/16 | 71941649 | 236,657.00 | 77,760.00 [1] |

**Garden Care**
06/11/2010
05/01/2018

Total Column 2: 1,787,725.00
Total Collected by Plaintiff: 1,077,961.27

Total Due: 709,763.73

| Golden Gate | 7004322 | 12/31/10 | 11921044 | 386,342.00 | 20,102.00 [1] |
|---|---|---|---|---|---|
| Golden Gate | 7004322 | 12/31/10 | 11921044 | 386,342.00 | 194,672.00 [1] |
| Golden Gate | 7004322 | 12/31/11 | 21911432 | 392,342.00 | 392,342.00 |
| Golden Gate | 7004322 | 12/31/12 | 31981751 | 332,342.00 | 332,342.00 |
| Golden Gate | 7004322 | 12/31/13 | 41891521 | 276,342.00 | 276,342.00 |
| Golden Gate | 7004322 | 12/31/13 | 41891521 | 276,342.00 | 276,342.00 |
| Golden Gate | 7004322 | 12/31/15 | 61851430 | 296,342.00 | 296,342.00 |
| Golden Gate | 7004322 | 12/31/16 | 71641629 | 342,943.00 | 342,943.00 |
| Golden Gate | 7004322 | 12/31/16 | 71641629 | 342,943.00 | 342,943.00 |
| Golden Gate | 7004322 | 12/31/16 | 71641629 | 342,943.00 | 112,800.00 [1] |

**Golden Gate**
06/11/2010
05/01/2018

Total Column 2: 2,587,170.00
Total Collected by Plaintiff: 1,768,337.98

Total Due: 818,832.02

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| Grace Plaza | 2913301 | 12/31/10 | 11581213 | 465,115.00 | 24,206.00 [1] |
| Grace Plaza | 2913301 | 12/31/10 | 11581213 | 465,115.00 | 234,416.00 [1] |
| Grace Plaza | 2913301 | 12/31/11 | 21701250 | 471,115.00 | 471,115.00 |
| Grace Plaza | 2913301 | 12/31/12 | 32042309 | 471,115.00 | 471,115.00 |
| Grace Plaza | 2913301 | 12/31/13 | 41751207 | 471,115.00 | 471,115.00 |
| Grace Plaza | 2913301 | 12/31/13 | 41751207 | 471,115.00 | 471,115.00 |
| Grace Plaza | 2913301 | 12/31/15 | 61541714 | 471,115.00 | 471,115.00 |
| Grace Plaza | 2913301 | 12/31/16 | 71501224 | 546,754.00 | 546,754.00 |
| Grace Plaza | 2913301 | 12/31/16 | 71501224 | 546,754.00 | 546,754.00 |
| Grace Plaza | 2913301 | 12/31/16 | 71501224 | 546,754.00 | 179,760.00 [1] |

**Grace Plaza**
**06/11/2010**
**05/01/2018**

| | |
|---|---|
| **Total Column 2:** | 3,887,465.00 |
| **Total Collected by Plaintiff:** | 2,661,006.59 |
| **Total Due:** | 1,226,458.41 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| Hamptons | 5126303 | 12/31/10 | 13111621 | 364,664.00 | 18,981.00 [1] |
| Hamptons | 5126303 | 12/31/10 | 13111621 | 364,664.00 | 183,816.00 [1] |
| Hamptons | 5126303 | 12/31/11 | 22271524 | 388,368.00 | 388,368.00 |
| Hamptons | 5126303 | 12/31/12 | 31791239 | 370,664.00 | 370,664.00 |
| Hamptons | 5126303 | 12/31/13 | 42241513 | 374,910.00 | 374,910.00 |
| Hamptons | 5126303 | 12/31/14 | 52231523 | 583,692.00 | 583,692.00 |
| Hamptons | 5126303 | 12/31/15 | 61901437 | 396,141.00 | 396,141.00 |
| Hamptons | 5126303 | 12/31/16 | 71741008 | 555,778.00 | 555,778.00 |
| Hamptons | 5126303 | 12/31/16 | 71741008 | 555,778.00 | 555,778.00 |
| Hamptons | 5126303 | 12/31/16 | 71741008 | 555,778.00 | 182,760.00 [1] |

**Hamptons**
**06/11/2010**
**05/01/2018**

| | |
|---|---|
| **Total Column 2:** | 3,610,888.00 |
| **Total Collected by Plaintiff:** | 2,484,664.36 |
| **Total Due:** | 1,126,223.64 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| Little Neck (1) | 7003408 | 12/31/11 | 22122326 | 281,714.00 | 14,668.00 [1] |
| Little Neck (1) | 7003408 | 12/31/11 | 22122326 | 281,714.00 | 216,932.00 [1] |

**Little Neck (1)**
**06/11/2010**
**04/07/2011**

| | |
|---|---|
| **Total Column 2:** | 231,600.00 |
| **Total Collected by Plaintiff:** | 45,561.00 |
| **Total Due:** | 186,039.00 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| Little Neck (2) | 7003408 | 12/31/11 | 22122326 | 281,714.00 | 65,620.00 [1] |
| Little Neck (2) | 7003408 | 12/31/11 | 22122326 | 281,714.00 | 281,714.00 |
| Little Neck (2) | 7003408 | 12/31/12 | 32181813 | 260,554.00 | 260,554.00 |
| Little Neck (2) | 7003408 | 12/31/13 | 42121550 | 219,459.00 | 219,459.00 |
| Little Neck (2) | 7003408 | 12/31/13 | 42121550 | 219,459.00 | 219,459.00 |
| Little Neck (2) | 7003408 | 12/31/15 | 61791715 | 223,983.00 | 223,983.00 |
| Little Neck (2) | 7003408 | 12/31/16 | 71711644 | 249,914.00 | 249,914.00 |
| Little Neck (2) | 7003408 | 12/31/16 | 71711644 | 249,914.00 | 249,914.00 |
| Little Neck (2) | 7003408 | 12/31/16 | 71711644 | 249,914.00 | 15,755.00 [1] |

**Little Neck (2)**
**04/07/2011**
**01/24/2018**

| | |
|---|---|
| **Total Column 2:** | 1,786,372.00 |
| **Total Collected by Plaintiff:** | 936,922.42 |
| **Total Due:** | 849,449.58 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|------|---------|------|-----|------|------|
| Nassau | 2906305 | 12/31/10 | 13111612 | 526,250.00 | 27,398.00 [1] |
| Nassau | 2906305 | 12/31/10 | 13111612 | 526,250.00 | 265,328.00 [1] |
| Nassau | 2906305 | 12/31/11 | 21931405 | 532,250.00 | 532,250.00 |
| Nassau | 2906305 | 12/31/12 | 31761126 | 502,250.00 | 502,250.00 |
| Nassau | 2906305 | 12/31/13 | 42031438 | 472,250.00 | 472,250.00 |
| Nassau | 2906305 | 12/31/14 | 52241446 | 659,801.00 | 659,801.00 |
| Nassau | 2906305 | 12/31/15 | 61961610 | 472,250.00 | 472,250.00 |
| Nassau | 2906305 | 12/31/16 | 71881226 | 523,604.00 | 523,604.00 |
| Nassau | 2906305 | 12/31/16 | 71881226 | 523,604.00 | 523,604.00 |
| Nassau | 2906305 | 12/31/16 | 71881226 | 523,604.00 | 172,200.00 [1] |

**Nassau**
**06/11/2010**
**05/01/2018**

| | Total Column 2: | 4,150,935.00 |
|---|---|---|
| | Total Collected by Plaintiff: | 3,193,674.37 |
| | **Total Due:** | 957,260.63 |

| Name | OPCert# | Date | DCN | | |
|------|---------|------|-----|------|------|
| New Surfside | 7003373 | 12/31/10 | 12021701 | 256,400.00 | 13,338.00 [1] |
| New Surfside | 7003373 | 12/31/10 | 12021701 | 256,400.00 | 129,168.00 [1] |
| New Surfside | 7003373 | 12/31/11 | 22050939 | 262,400.00 | 262,400.00 |
| New Surfside | 7003373 | 12/31/12 | 32241454 | 202,400.00 | 202,400.00 |
| New Surfside | 7003373 | 12/31/13 | 42091632 | 147,522.00 | 147,522.00 |
| New Surfside | 7003373 | 12/31/14 | 53240932 | 295,710.00 | 295,710.00 |
| New Surfside | 7003373 | 12/31/15 | 61731629 | 173,132.00 | 173,132.00 |
| New Surfside | 7003373 | 12/31/16 | 71811327 | 219,086.00 | 219,086.00 |
| New Surfside | 7003373 | 12/31/16 | 71811327 | 219,086.00 | 219,086.00 |
| New Surfside | 7003373 | 12/31/16 | 71811327 | 219,086.00 | 72,000.00 [1] |

**New Surfside**
**06/11/2010**
**05/01/2018**

| | Total Column 2: | 1,733,842.00 |
|---|---|---|
| | Total Collected by Plaintiff: | 1,098,949.14 |
| | **Total Due:** | 634,892.86 |

| Name | OPCert# | Date | DCN | | |
|------|---------|------|-----|------|------|
| Park Avenue | 2902306 | 12/31/10 | 13111615 | 417,845.00 | 21,755.00 [1] |
| Park Avenue | 2902306 | 12/31/10 | 13111615 | 417,845.00 | 210,680.00 [1] |
| Park Avenue | 2902306 | 12/31/11 | 21881127 | 423,845.00 | 423,845.00 |
| Park Avenue | 2902306 | 12/31/12 | 31751150 | 393,845.00 | 393,845.00 |
| Park Avenue | 2902306 | 12/31/13 | 41970949 | 363,845.00 | 363,845.00 |
| Park Avenue | 2902306 | 12/31/13 | 41970949 | 363,845.00 | 363,845.00 |
| Park Avenue | 2902306 | 12/31/15 | 61891012 | 363,845.00 | 363,845.00 |
| Park Avenue | 2902306 | 12/31/16 | 71741044 | 467,209.00 | 467,209.00 |
| Park Avenue | 2902306 | 12/31/16 | 71741044 | 467,209.00 | 467,209.00 |
| Park Avenue | 2902306 | 12/31/16 | 71741044 | 467,209.00 | 153,600.00 [1] |

**Park Avenue**
**06/11/2010**
**05/01/2018**

| | Total Column 2: | 3,229,678.00 |
|---|---|---|
| | Total Collected by Plaintiff: | 1,928,935.74 |
| | **Total Due:** | 1,300,742.26 |

| Name | OPCert# | Date | DCN | | |
|------|---------|------|-----|------|------|
| Parkview (1) | 2952301 | 12/31/11 | 21951110 | 297,998.00 | 74,256.00 [1] |
| Parkview (1) | 2952301 | 12/31/12 | 31711426 | 259,337.00 | 10,665.00 [1] |

**Parkview (1)**
**10/01/2011**
**10/16/2012**

| | Total Column 2: | 84,921.00 |
|---|---|---|
| | Total Collected by Plaintiff: | 73,106.32 |
| | **Total Due:** | 11,814.68 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|---|---|---|---|---|---|
| | | | | **NYS Dept. of Health RHCF Cost Report Data** | |
| Parkview (2) | 2952301 | 12/31/13 | 41701341 | 275,102.00 | 69,368.00 [1] |
| Parkview (2) | 2952301 | 12/31/14 | 52221431 | 306,479.00 | 306,479.00 |
| Parkview (2) | 2952301 | 12/31/15 | 61891347 | 309,214.00 | 309,214.00 |
| Parkview (2) | 2952301 | 12/31/16 | 71571133 | 305,102.00 | 305,102.00 |
| Parkview (2) | 2952301 | 12/31/16 | 71571133 | 305,102.00 | 305,102.00 |
| Parkview (2) | 2952301 | 12/31/16 | 71571133 | 305,102.00 | 100,320.00 [1] |
| **Parkview (2)** | | | | **Total Column 2:** | 1,395,585.00 |
| 09/30/2013 | | | | **Total Collected by Plaintiff:** | 645,457.72 |
| 05/01/2018 | | | | **Total Due:** | 750,127.28 |
| Pathways | 4652302 | 12/31/11 | 22211506 | 470,632.00 | 144,368.00 [1] |
| Pathways | 4652302 | 12/31/12 | 31921428 | 434,496.00 | 434,496.00 |
| Pathways | 4652302 | 12/31/13 | 42261356 | 434,990.00 | 434,990.00 |
| Pathways | 4652302 | 12/31/13 | 42261356 | 434,990.00 | 434,990.00 |
| Pathways | 4652302 | 12/31/13 | 42261356 | 434,990.00 | 434,990.00 |
| Pathways | 4652302 | 12/31/15 | 61931350 | 475,184.00 | 475,184.00 |
| Pathways | 4652302 | 12/31/16 | 71701353 | 453,704.00 | 453,704.00 |
| Pathways | 4652302 | 12/31/16 | 71701353 | 453,704.00 | 453,704.00 |
| Pathways | 4652302 | 12/31/16 | 71701353 | 453,704.00 | 149,160.00 [1] |
| **Pathways** | | | | **Total Column 2:** | 3,415,586.00 |
| 09/10/2010 | | | | **Total Collected by Plaintiff:** | 1,666,733.60 |
| 05/01/2018 | | | | **Total Due:** | 1,748,852.40 |
| Southpoint | 2961302 | 12/31/10 | 11931249 | 345,598.00 | 17,993.00 [1] |
| Southpoint | 2961302 | 12/31/10 | 11931249 | 345,598.00 | 174,248.00 [1] |
| Southpoint | 2961302 | 12/31/11 | 22051106 | 351,598.00 | 351,598.00 |
| Southpoint | 2961302 | 12/31/12 | 32052329 | 309,598.00 | 309,598.00 |
| Southpoint | 2961302 | 12/31/13 | 41971035 | 268,526.00 | 268,526.00 |
| Southpoint | 2961302 | 12/31/13 | 41971035 | 268,526.00 | 268,526.00 |
| Southpoint | 2961302 | 12/31/15 | 61831133 | 267,598.00 | 267,598.00 |
| Southpoint | 2961302 | 12/31/16 | 71691311 | 298,370.00 | 298,370.00 |
| Southpoint | 2961302 | 12/31/16 | 71691311 | 298,370.00 | 298,370.00 |
| Southpoint | 2961302 | 12/31/16 | 71691311 | 298,370.00 | 98,040.00 [1] |
| **Southpoint** | | | | **Total Column 2:** | 2,352,867.00 |
| 06/11/2010 | | | | **Total Collected by Plaintiff:** | 1,209,259.55 |
| 05/01/2018 | | | | **Total Due:** | 1,143,607.45 |
| Springcreek | 7001384 | 12/31/10 | 11921048 | 243,371.00 | 12,673.00 [1] |
| Springcreek | 7001384 | 12/31/10 | 11921048 | 243,371.00 | 122,728.00 [1] |
| Springcreek | 7001384 | 12/31/11 | 21911451 | 249,371.00 | 249,371.00 |
| Springcreek | 7001384 | 12/31/12 | 31981755 | 219,371.00 | 219,371.00 |
| Springcreek | 7001384 | 12/31/13 | 41900938 | 197,152.00 | 197,152.00 |
| Springcreek | 7001384 | 12/31/13 | 41900938 | 197,152.00 | 197,152.00 |
| Springcreek | 7001384 | 12/31/15 | 61851252 | 236,058.00 | 236,058.00 |
| Springcreek | 7001384 | 12/31/16 | 71641253 | 267,390.00 | 267,390.00 |
| Springcreek | 7001384 | 12/31/16 | 71641253 | 267,390.00 | 267,390.00 |
| Springcreek | 7001384 | 12/31/16 | 71641253 | 267,390.00 | 87,960.00 [1] |
| **Springcreek** | | | | **Total Column 2:** | 1,857,245.00 |
| 06/11/2010 | | | | **Total Collected by Plaintiff:** | 2,721,209.19 |
| 05/01/2018 | | | | **Total Due:** | -863,964.19 |

Note 2: Seagate, Part of Spingcreek, does not report Workmen's Compensation
Insurance (0157-026) creating a negative collected.

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|------|---------|------|-----|-----------------------------------------------------|------------------------------------------------|
| Throgs Neck | 7000386 | 12/31/10 | 12091609 | 373,073.00 | 19,418.00 [1] |
| Throgs Neck | 7000386 | 12/31/10 | 12091609 | 373,073.00 | 188,048.00 [1] |
| Throgs Neck | 7000386 | 12/31/11 | 22051012 | 379,073.00 | 379,073.00 |
| Throgs Neck | 7000386 | 12/31/12 | 32042348 | 379,073.00 | 379,073.00 |
| Throgs Neck | 7000386 | 12/31/13 | 42041642 | 379,073.00 | 379,073.00 |
| Throgs Neck | 7000386 | 12/31/14 | 52250958 | 516,387.00 | 516,387.00 |
| Throgs Neck | 7000386 | 12/31/15 | 61951413 | 379,073.00 | 379,073.00 |
| Throgs Neck | 7000386 | 12/31/16 | 71951008 | 391,073.00 | 391,073.00 |
| Throgs Neck | 7000386 | 12/31/16 | 71951008 | 391,073.00 | 391,073.00 |
| Throgs Neck | 7000386 | 12/31/16 | 71951008 | 391,073.00 | 128,520.00 [1] |

| | | | |
|---|---|---|---|
| **Throgs Neck** | | **Total Column 2:** | 3,150,811.00 |
| 06/11/2010 | | **Total Collected by Plaintiff:** | 1,531,076.73 |
| 05/01/2018 | | **Total Due:** | 1,619,734.27 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|------|---------|------|-----|-----------------------------------------------------|------------------------------------------------|
| Townhouse | 2950318 | 12/31/10 | 13111618 | 643,357.00 | 33,497.00 [1] |
| Townhouse | 2950318 | 12/31/10 | 13111618 | 643,357.00 | 324,392.00 [1] |
| Townhouse | 2950318 | 12/31/11 | 21951539 | 649,357.00 | 649,357.00 |
| Townhouse | 2950318 | 12/31/12 | 31921113 | 607,357.00 | 607,357.00 |
| Townhouse | 2950318 | 12/31/13 | 42100924 | 565,357.00 | 565,357.00 |
| Townhouse | 2950318 | 12/31/13 | 42100924 | 565,357.00 | 565,357.00 |
| Townhouse | 2950318 | 12/31/15 | 61890939 | 565,357.00 | 565,357.00 |
| Townhouse | 2950318 | 12/31/16 | 71811531 | 607,547.00 | 607,547.00 |
| Townhouse | 2950318 | 12/31/16 | 71811531 | 607,547.00 | 607,547.00 |
| Townhouse | 2950318 | 12/31/16 | 71811531 | 607,547.00 | 199,800.00 [1] |

| | | | |
|---|---|---|---|
| **Townhouse** | | **Total Column 2:** | 4,725,568.00 |
| 06/11/2010 | | **Total Collected by Plaintiff:** | 2,891,202.38 |
| 05/01/2018 | | **Total Due:** | 1,834,365.62 |

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|------|---------|------|-----|-----------------------------------------------------|------------------------------------------------|
| White Plains | 5902315 | 12/31/10 | 11651632 | 137,254.00 | 7,144.00 [1] |
| White Plains | 5902315 | 12/31/10 | 11651632 | 137,254.00 | 69,184.00 [1] |
| White Plains | 5902315 | 12/31/11 | 21841646 | 143,254.00 | 143,254.00 |
| White Plains | 5902315 | 12/31/12 | 32061901 | 128,254.00 | 128,254.00 |
| White Plains | 5902315 | 12/31/13 | 41881503 | 113,254.00 | 113,254.00 |
| White Plains | 5902315 | 12/31/13 | 41881503 | 113,254.00 | 113,254.00 |
| White Plains | 5902315 | 12/31/15 | 61941204 | 118,359.00 | 118,359.00 |
| White Plains | 5902315 | 12/31/16 | 71701842 | 156,168.00 | 156,168.00 |
| White Plains | 5902315 | 12/31/16 | 71701842 | 156,168.00 | 156,168.00 |
| White Plains | 5902315 | 12/31/16 | 71701842 | 156,168.00 | 9,844.00 [1] |

| | | | |
|---|---|---|---|
| **White Plains** | | **Total Column 2:** | 1,014,883.00 |
| 06/11/2010 | | **Total Collected by Plaintiff:** | 711,780.00 |
| 01/24/2018 | | **Total Due:** | 303,103.00 |

**NYS Dept. of Health**
**RHCF Cost Report Data**

| Name | OPCert# | Date | DCN | Workmens Compensation Insurance Reported (0157-026) | 2 - Prorated to Policy Inception / Termination |
|------|---------|------|-----|------|------|
| | | | | **NYS Dept. of Health** **RHCF Cost Report Data** | |
| Woodmere | 2950315 | 12/31/10 | 11951141 | 654,282.00 | 34,067.00 [1] |
| Woodmere | 2950315 | 12/31/10 | 11951141 | 654,282.00 | 329,912.00 [1] |
| Woodmere | 2950315 | 12/31/11 | 22351418 | 660,282.00 | 660,282.00 |
| Woodmere | 2950315 | 12/31/12 | 32042218 | 630,282.00 | 630,282.00 |
| Woodmere | 2950315 | 12/31/13 | 41881437 | 600,282.00 | 600,282.00 |
| Woodmere | 2950315 | 12/31/13 | 41881437 | 600,282.00 | 600,282.00 |
| Woodmere | 2950315 | 12/31/15 | 61731456 | 440,094.00 | 440,094.00 |
| Woodmere | 2950315 | 12/31/16 | 71641114 | 360,000.00 | 360,000.00 |
| Woodmere | 2950315 | 12/31/16 | 71641114 | 360,000.00 | 360,000.00 |
| Woodmere | 2950315 | 12/31/16 | 71641114 | 360,000.00 | 118,320.00 [1] |

**Woodmere**
**06/11/2010**
**05/01/2018**

**Total Column 2:** 4,133,521.00
**Total Collected by Plaintiff:** 2,217,169.17

**Total Due:** 1,916,351.83

**Total Report Column 2:** 71,195,817.00
**Total Report Collected by Plaintiff:** 41,232,180.39

**Total Due:** 29,963,636.61

Note 1: Prorated to Policy Inception / Termination

Note 3: Sentosa is Not Included as it is Not a SNF

Note 4: Years 2017 and 2018 are based on the 12/31/16 Cost Report as the most recently available public data